Kenneth R. JACKSON, Jr., Plaintiff,

v.

**TRUCK DRIVERS' UNION LOCAL 42 HEALTH AND WELFARE FUND, et al., Defendants.**

Civil Action No. 92–10242–PBS.

United States District Court, D. Massachusetts.

Aug. 7, 1996.

1128

G. Rosalyn Johnson, Lynn, MA, for Kenneth A. Jackson, Jr.

Gary S. Witlen, Paula J. Caira, International Brotherhood of Teamsters, Washington, DC, Kathryn M. Noonan, Law Office of Kathryn Noonan, Newton, MA, for International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America.

Gabriel O. Dumont, Jr., Law Offices of Gabriel Dumont, Boston, MA, for Truck Drivers, Chauffeurs & Helpers Union, Local 42, Tyrrell Consultants, Inc.

John D. Burke, Gabriel O. Dumont, Jr., Law Offices of Gabriel Dumont, Boston, MA, for Philip Morin.

John D. Burke, Law Offices of Gabriel Dumont, Boston, MA, for Truck Drivers' Union Local 42 Health & Welfare Fund.

Lawrence P. Higgins, Arlington, MA, for International Union, Health and Welfare Fund, Local 42.

David J. Hatem, Burns & Levinson, Boston, MA, for Ulico Casualty Co.

Harold Owen Beede, G. Rosalyn Johnson, P.C., Lynn, MA, for John J. Tyrrell, Jr.

John J. Tyrrell, Jr., Rockport, MA, pro se.

John F. Farraher, Grady & Dwyer, Boston, MA, Lawrence P. Higgins, Arlington, MA, Matthew E. Dwyer, Dwyer & Jenkins, Boston, MA, for New England Teamster and Baking Industry Health & Welfare Fund, Robert T. Marshall, Sandra Crane.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### I. *Introduction*

Although he had always paid his health care premiums, plaintiff, Kenneth Jackson, Jr., a beneficiary of the Truck Drivers' Union Local 42 Health and Welfare Fund ("Local 42 Fund"), was denied medical benefits for a kidney transplant, renal dialysis, and related dental expenses, when the Local 42 Fund was terminated without satisfying its outstanding obligations.

As a result, Jackson brought the present action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* against the Local 42 Fund; its trustees, Philip Morin and Laurence Moran; the transferee trust, the New England Teamster and Baking Industry Health and Welfare Fund (the "Bakers' Fund");[1] its fund manager, Sandra Crane; and Robert J. Marshall, its Trustee and Chairman of the Board. He seeks payment of his medical benefits, late charges, costs and attorneys fees. The Local 42 Fund Trustees have moved for summary judgment (Docket Nos. 108 & 143) as to all counts of Jackson's complaint.[2] Jackson has filed his own motion for summary judgment as to Count I. After hearing, the Court *DENIES* Defendants' motion and *ALLOWS* Plaintiff's motion.

In summary, the Court holds that plaintiff has presented sufficient admissible evidence to create genuine issues of material fact on his claims that the Local 42 Trustees breached their fiduciary duties by mismanaging fund assets, terminating the fund without paying outstanding obligations in violation of the trust provisions, and making misrepresentations to plaintiff, a plan beneficiary. Further, the Court holds that an aggrieved beneficiary has standing to sue the trustees of a defunct employee benefit plan for restitution of benefits due under a plan, the termination of which was implemented in violation of the trustees' fiduciary duty. Finally, the Court concludes it has equitable power to revive a defunct plan to collect or hold assets owed to plan beneficiaries and/or impose a constructive trust over plan assets improperly transferred to another benefit plan, if the first plan was terminated in a manner which violated the trust provisions.

### II. *Background*

This case has a protracted and complex factual and procedural history. In the interest of brevity, therefore, the Court relates only those facts pertinent to the present motions.

### A. *The Local 42 Fund*

The Local 42 Fund was a trust created in 1972 pursuant to collective bargaining agreements between Truck Drivers' Union Local 42 of the International Brotherhood of Teamsters, Chauffeurs and Warehousemen of America and various employers. Dumont Aff. Ex. 1 (Local 42 Fund Declaration of Trust, at 1). The trust directs the eight Trustees "to provide such benefits, by means of insurance policies or otherwise, as the Trustees in their sole discretion may deem fit and prudent for employees and/or their de-

---

1. The remaining defendants include Tyrrell Consultants, Inc., and John J. Tyrrell, Jr., as the Plan Administrators of Local 42 Fund. Tyrrell has not joined in the present motion.

2. The amended complaint includes the following counts: liability for unpaid medical benefits (Counts I–III); discrimination in paying benefits for end stage renal disease (Count IV); breach of fiduciary duties (Count VII); fraud (Count IX);

liability of successor trustee (Count X); fraudulent conveyance (Count XI). Counts V–VI & VIII were dismissed or denied amendment. Count IV has been released as against certain defendants and has not been pressed on summary judgment and is therefore dismissed. For reasons stated later in this opinion, Count IX is recast as a claim for breach of fiduciary duty and Count XI is dismissed.

pendents covering medical, surgical, and hospital care," as well as other enumerated benefits. *Id.* art. II, § 4(b). In addition, the trust instrument states that "the administration of the Fund shall conform to the applicable requirements of [ERISA]," *id.* amend. no. 1, and there is no dispute that the Local 42 Fund was an "employee welfare benefit plan" within the purview of ERISA. 29 U.S.C. § 1002(1).[3]

The trust permits the Trustees to "exercise every [ ] right, discretion and privilege pertaining or incident to Trust management as provided for or permitted by law." Declaration of Trust, art. II, § 1. In addition to this general authorization, the trust specifically enabled the Trustees to "delegate any of their ministerial powers or duties to any one or more of the remaining Trustees, or to any agent, administrator or employee engaged by the Trustees collectively." *Id.,* art. II, § 10.

Exercising this power to delegate, the Trustees hired several parties to aid their administration of the Local 42 Fund. From the inception of the plan in 1970 until March 1988, John Donaghey, president of the Don-Well company, acted as a collection agent of employer contributions. John Tyrrell, Jr., president of Tyrrell Consultants, Inc. ("TCI") acted as a claims agent from 1970 until 1988, at which time Tyrrell took on full responsibility as the third-party administrator of the plan. From March 1, 1982, until September 30, 1986, the plan was fully-insured by the Union Labor Life Insurance Company ("ULLICO"), which provided medical and hospitalization coverage for eligible plan members and dependents.

**3.** ERISA, 29 U.S.C. § 1002(1) defines an "employee welfare benefit plan" as "any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical surgical, or hospital care or benefits...."

**4.** From 1982 until October 1985, Don-Well issued separate checks for TCI's fees and ULLICO's premiums, sent them to TCI, and TCI forwarded the premium check to ULLICO. DOL Report at 6-7. After October 1985, Don-Well

## B. *The Fund Falters*

The following facts are culled from a Department of Labor ("DOL") investigative report dated September 13, 1990, and cited by both parties in various pleadings submitted to the Court. *See* Def. Trustees' Memo in Supp. of Mot. for Summ.J. app. F; Pl.'s Reply to Def. Trustees' Opp. to Substitute, ex. 1. Apparently, the parties do not dispute the accuracy of its factual findings, and the Court accepts as uncontested the facts related therein. Fed.R.Evid. 803(8) (public records exception to hearsay rule).

Beginning in 1982, the Trustees authorized an insurance payment procedure whereby TCI made the monthly premium payments to ULLICO.[4] TCI was usually 1–4 months late in paying these premiums, and ULLICO sent seven delinquency notices to TCI regarding late payments from 1984 to 1986.[5] After adjusting for inflation, the DOL concluded that delinquency charges and lost interest resulting from the late payments caused a total loss to the Local 42 Fund of $87,438. DOL Report at 7. According to the DOL Report, "cash flow" problems were discussed at trustee meetings held on June 14 and 28, 1985. Trustee Morin stated that he was aware of the ULLICO late charges but did not know the cause while Trustee Moran stated that he remained ignorant of the late charges and that Tyrrell never brought them to his attention. *Id.* at 8. In addition, an accounting audit of the fund by R. Morella of Watchmaker & Company showed that TCI had been overpaid a total of $32,890 over plan years 1986–89. *Id.* at 9.[6] The Trustees

sent TCI a single monthly check for both amounts, and TCI would deduct its fees and send the remainder to ULLICO. *Id.* at 7.

**5.** DOL Report, at 7. As shown in the report, ULLICO sent delinquency notices to TCI on November 2, 1984; December 14, 1984; October 16, 1985; November 21, 1985; May 8, 1986; June 24, 1986; and October 22, 1986. *Id.*

**6.** The audit showed that TCI had been overpaid $56,442.38 over 1987 and $31,129 over 1988. TCI was owed $51,781.38 and $2900 by the plan for 1986 and 1989 respectively. Offsetting the debts owed TCI shows an overpayment of $32,890. DOL Report at 9.

were informed of these overpayments by management letters from Morella. *Id.*

At a trustee meeting held on December 30, 1986, Tyrrell distributed a memorandum to the Local 42 Fund Trustees recommending that the fund convert from being fully-insured to self-insured status with stop-loss coverage.[7] A virtually simultaneous letter from ULLICO to the Trustees, dated January 16, 1987, terminated the policy effective retroactively September 30, 1986, for non-payment of premiums and monies owed ULLICO.[8] At the December 1986 meeting, Tyrrell also recommended that fund administration be consolidated and either Don–Well or TCI be terminated. At a trustee meeting held February 13, 1987, the Trustees adopted Tyrrell's self-insurance plan, effective March 1, 1987. At a March 11, 1988 meeting of the Trustees, TCI was made the sole administrator of the Local 42 Fund.

The Local 42 Fund's financial difficulties did not abate after it became self-insured. Although the record is somewhat sparse on details, there is evidence that from 1987 to 1990 the trust's liabilities outpaced its available reserves for paying claims. By February 1991, the plan had amassed approximately $1.2 million in unpaid claims. Crane Dep. at 104. At that time, the Local 42 Fund again became fully insured through CNA insurance company. Morin Aff. ¶ 3; Pl. Reply to Def. Trustees' Opp. to Substitute, Ex. 4. Plan administration then also was transferred from TCI to Efficient Management Systems, Inc. *Id.* Due to increases in the cost of premiums, however, the Trustees anticipated in 1992 that the Local 42 Fund could not afford to continue to insure fully through CNA. Morin Aff. ¶ 6.

It also bears noting that the Local 42 Fund was operating with an insufficient number of Trustees at this time. Although the trust instrument requires eight trustees to be appointed and requires at least four trustees (two employer and two employee) to constitute a quorum for conducting business, retiring trustees were not replaced over the years. As a result, it appears that only Trustees Morin and Moran were involved in the majority of the business decisions detailed above. DOL Report at 11. The trust was amended on July 21, 1991, to provide for only two trustees (one employer and one employee trustee) by a so-called "unanimous vote," but only one signature (i.e., Moran) appears below the amendment. Dumont Aff. app. At the time of this "unanimous" amendment, the trust appears already to have been conducting business with fewer than the four trustees necessary to constitute a quorum. DOL Report at 11.

Based on the events described above, *inter alia,* the DOL brought ERISA civil enforcement actions for breach of fiduciary duties against Tyrrell and TCI and Trustees Morin and Moran on December 7, 1990. The DOL alleged that Tyrrell and TCI breached fiduciary duties to fund beneficiaries by failing to pay ULLICO premiums on time and using plan funds for their own benefit. The Trustees were alleged to have breached their fiduciary duties by failing to establish and

---

7. An insured, or fully-insured, plan is one in which the plan purchases insurance from a regulated insurance company. A self-insured plan is one in which benefits are paid from contributions supplied by employers without outside insurance. *See Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 732, 105 S.Ct. 2380, 2385, 85 L.Ed.2d 728 (1985) (explaining distinction). Among other differences, fully-insured plans are subject to indirect state regulation by virtue of their insurance contracts while self-insured plans are not. *Id.* at 748, 105 S.Ct. at 2393–94; *FMC Corp. v. Holliday,* 498 U.S. 52, 61–63, 111 S.Ct. 403, 409–10, 112 L.Ed.2d 356 (1990) (holding that state regulation of self-insured ERISA plans preempted while insured plans subject to indirect regulation because underlying insurance contracts regulable) (citing

*Metropolitan Life*). "Stop-loss insurance policies can be defined as insurance policies which insure employee benefit plans for excess or catastrophic loss over specified aggregate amounts under the terms of the policy." Devon P. Groves, *ERISA Waivers and State Health Care Reform,* 28 Colum.J.L. & Soc.Probs. 609, 626 n. 94 (1995) (internal quotation marks and citation omitted). Stop-loss insurance is simply a form of reinsurance for self-insured plans.

8. ULLICO would have reinstated the policies if the Trustees agreed to a full accounting of all premiums and claims, submitted a formal request letter and a monthly advance deposit, and changed the programs from self-administration to administration by the insurer. DOL Report, at 10.

maintain internal controls for plan administration and to monitor adequately Tyrrell and TCI's payment of insurance premiums. *DeArment v. Tyrrell Consultants, Inc. et al.,* No. 90–12964–WD, Complaint at ¶ 9–13. This lawsuit ended with consent decrees entered in 1993 permanently enjoining Tyrrell and the Trustees from serving in a fiduciary capacity with respect to an ERISA plan. *See Martin v. Tyrrell Consultants, Inc. et al.,* No. 90–12964–WD (April 13, 1993) (consent judgment and order regarding Trustees); *Reich v. Tyrrell Consultants, Inc. et al.,* No. 90–12964–WD (Aug. 4, 1993) (consent judgment and order regarding Tyrrell and TCI).[9]

### C. The Bakers' Fund Merger

According to Morin, "[b]ecause of the relatively small number of participants in the Local 42 Plan and the then ever rising health care costs, the Trustees of the Local 42 Fund believed that [ ] a merger was the only way to insure continued health insurance coverage for participants and their families." Moran Aff. ¶ 2. In 1989 and early 1990, therefore, the Trustees made merger proposals to several larger funds, including the New England Teamsters and Baking Industry Health Benefits and Insurance Fund ("Bakers Fund").[10] After receiving no favorable response to these solicitations, the Trustees approached the Bakers' Fund again in 1991 to discuss a merger. *Id.* at ¶ 4.[11] Negotiations continued through August 1992 culminating in a merger of the two plans.

On August 28, 1992, the Trustees of the Local 42 Fund and the Bakers' Fund executed an agreement providing for the transfer of the former's assets to the latter. *Id.* at ¶ 8; Merger Agreement ¶ 4–5. In exchange, the Bakers' Fund agreed to provide insurance coverage prospectively to all former Local 42 Fund participants effective October 1, 1992. Merger Agreement ¶ 8–9. However, the Bakers' Fund did not assume liability for claims already "in the pipeline" prior to the merger (i.e., the Local 42 Fund's pre-merger outstanding liabilities). *Id.* at ¶ 10. The Bakers' Fund agreed to use its "best efforts" to obtain releases for prior claims but had no other obligation with respect to former beneficiaries of the Local 42 Fund who had lodged claims before the merger. *Id.* at ¶ 11–13. The outstanding liabilities of the fund were listed in "schedule D" appended to the Merger Agreement on which Jackson's name appears. Pl.'s Memo. on Propriety of Awarding Atty.'s Fees from Bakers' Fund, Ex. A.

With the execution of the Merger Agreement, the Local 42 Fund Trustees agreed to terminate their trust and wind up their affairs "in accordance with applicable law and the terms of . . . the Declaration of Trust, as amended." *Id.* ¶ 2A. The Declaration of Trust provided the following key language with respect to trust termination:

> In the event of termination of the Trust, or upon liquidation of the Trust, the Trustees shall continue to apply the Trust Fund, *so far as is practicable,* to the purposes specified in Section 4(b) of ARTICLE II *and any balance which cannot be so applied,* to such other purposes and by such means, including transfer of assets to another qualified Trust, as in the opinion of the Trustees will best effectuate the purposes of this Agreement and Declaration of Trust; and upon disbursal of the entire Trust Fund, this Trust shall terminate.

**9.** Defendants have moved for summary judgment on the ground of *res judicata* arguing that the Secretary of Labor's prior suit bars Jackson's action. After hearing, the Court **DENIES** this claim. Several courts have held that the Secretary of Labor and plan beneficiaries have separate interests in bringing ERISA claims and therefore are not in privity for purposes of *res judicata. See Secretary of Labor v. Fitzsimmons,* 805 F.2d 682, 693–94 (7th Cir.1986) (en banc); *Donovan v. Cunningham,* 716 F.2d 1455, 1462 (5th Cir.1983), *cert. denied,* 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984); *Picardi v. Chicago Truck Drivers,* 581 F.Supp. 794, 797 (N.D.Ill.1983).

**10.** The Bakers' Fund has not joined in the present motions for summary judgment. It has filed a motion to confirm settlement, or in the alternative, to reopen discovery that is addressed later in this opinion.

**11.** The Trustees singled out the Bakers' Fund because it had expressed the most interest in a merger during the earlier solicitations, it appeared financially sound, and its North Andover, Massachusetts, headquarters was conveniently located with respect to the majority of the Local 42 Fund's participants. Morin Aff. ¶ 4.

Declaration of Trust, art. V., § 3 (emphasis added). As previously stated, article II, section 4(b) directs the Trustees to apply trust funds to provide specified benefits, including coverage for medical, surgical and hospital care.

Pursuant to the agreement, the Local 42 Fund terminated on or about August 28, 1992. At that point, the fund had outstanding liabilities of $1,056,076.33. Crane Dep. at 105. Local 42 Fund assets totalling $239,972.06 were transferred to the Bakers' Fund. *Id.* at 106–10.[12] The Bakers' Fund followed through on its promise to attempt to compromise outstanding claims by offering 25 cents on the dollar to claimants listed on schedule D. *Id.* at 100, 114. On no claim did the Bakers' Fund agree to settle for more than this amount. *Id.* at 114. In settling claims as of July 1995, the Bakers' Fund has expended $190,160.89, leaving an unexpended surplus of former Local 42 Fund assets of approximately $50,000. *Id.* at 84. As of July 1995, a total of $292,162.77 of uncompromised Local 42 Fund liabilities remained outstanding. *Id.* at 88. Pursuant to stipulation, the Bakers' Fund has placed in escrow a sum of $49,875.32, representing the remainder of the defunct Local 42 Fund's assets.

### D. *Jackson's Claims*

Jackson was a participant in and beneficiary of the Local 42 Fund from approximately 1978 through 1992. In February 1990, Jackson experienced kidney trouble that caused him to undergo dialysis. His illness required him to have an organ transplant on January 30, 1991. During this period, Jackson incurred significant medical expenses associated with his kidney disease, totalling $66,922.76, which were disclosed as liabilities on the Merger Agreement, schedule D. Jackson submitted these and other claims for payment by the Local 42 Fund but received notices from his medical providers that his bills were not being paid in a timely fashion. Jackson Dep. at 13.

Concerned about the tardy payments, Jackson approached Trustee Morin personally in the summer of 1990. Jackson testified that Morin told him, "[d]on't worry about it. You are covered up to $1 million a year. There is no way you can run out of medical coverage." *Id.* at 14. Jackson subsequently contacted Morin by telephone and again was told not to be concerned about the fund's handling of his claims. *Id.* at 17–18. Jackson testified that he took Morin's assurances at "face value" as he was the union president and thus took no further action. *Id.* at 31.

At approximately the same time, TCI sent correspondence to fund beneficiaries that funding shortfalls had caused lengthy delays in paying claims and considerable dissatisfaction of participants. TCI informed plan participants, including Jackson, that benefits would be reduced as a result. Def. Trustees' Memo. in Supp. of Sum.J., Ex. B; Jackson Dep. at 42–43. This correspondence did not reveal that the Fund had amassed liabilities nearly four times greater than its assets. Jackson testified that had he been told by Morin to TCI that the Local 42 Fund did not have enough money to pay outstanding claims, he probably would have searched out "alternative measures." Jackson Dep. at 52.

In July 1991, Jackson through counsel demanded payment of his medical bills by the Local 42 Fund in a letter to Morin. He received a response dated July 31, 1991, from Tyrrell informing him: "It is the intention of the Health and Welfare Fund to pay all of the outstanding claims incurred prior to the program becoming fully insured. The Fund is currently in the process of making adjustments that should speed up payment of these claims." Pl.Mot. for Summ.J. on Count I, Ex. 10. All of the medical expenses at issue were incurred prior to February 1, 1991, during the period in which the Local 42 Fund was self-insured.

On January 6, 1992, one of Jackson's medical providers, Roger W. Sachs, D.M.D., sued

---

**12.** The Local 42 Fund's assets at the time of termination comprised $38,250 in State of Israel bonds and coupon interest, $1,674.40 from Unum Insurance Company, $39,263.82 in two bank accounts, $124,000 in employer contributions, and a then-unliquidated claim against Wet-

terau Corporation for unpaid contributions that was later settled for $36,783.84. Crane Dep. at 106–10; Merger Agreement ¶ 4 (providing for assignment of claims against Wetterau Corporation and Local 42 Fund assets). These sums total $239,972.06.

Jackson to collect unpaid bills in the amount of $2017.28 in Lynn District Court. Jackson named the Local 42 Fund in a third-party complaint and commenced the present action in this Court on January 30, 1992. The Bakers' Fund executed the Merger Agreement with notice of Jackson's state and federal actions against the Local 42 Fund. Merger Agreement, schedule B.

As with the other claimants listed on schedule D of the Merger Agreement, the Bakers' Fund attempted to settle with Jackson's medical providers. As of the commencement of the federal action, all of Jackson's claims were settled except that of Dr. Sachs and a claim lodged by the Medical Group for $6722.80. Def. Trustees' Rule 56.1 Statement of Material Facts not in Dispute ¶ 10–11.[13] In Massachusetts district court, separate judgment was granted against the fund for $2017.28 on November 12, 1993. *See Sachs v. Jackson,* Civ.Action No. 9213CV0035 (Lynn Dist.Ct.1993). This judgment remains uncollected, pending the outcome of the present action.

### III. *Discussion*

The present action's procedural path is long and tangled, with all parties incurring far more in legal expenses than the outstanding medical expenses. Several claims and defendants have been added and dismissed along the way. This motion for summary judgment presents only a segment of this sprawling litigation, but one of central significance upon which all of the others depend.

■ With respect to the Local 42 Fund Trustees, Jackson presents claims for breach of fiduciary duties running both to the plan itself and to him personally as a beneficiary.

With respect to the plan, he alleges that the Trustees breached their fiduciary duties to the Local 42 Fund by failing to exercise due care in administering the trust. With respect to his personal claims, Jackson contends that the Trustees violated fiduciary duties by transferring fund assets without providing for his outstanding liabilities, wrongly terminating the trust fund, and falsely assuring him that his claims would be paid.[14] He seeks damages on behalf of the plan under ERISA, 29 U.S.C. § 1109(a), § 1132(a)(2), and equitable relief in the form of restitution of benefits due under 29 U.S.C. § 1132(a)(3).[15]

Defendants make a two-fold argument in response. First, they assert that Jackson's claim essentially is one for damages to him personally, rather than to the now-defunct plan, and as such is barred by the Supreme Court's interpretation of ERISA. Second, even if his claims for damages and restitutionary relief should go forward, he is unable to establish a claim for breach of fiduciary duty on the record presented for summary judgment. The Court addresses each party's arguments seriatim.

### A. *Summary Judgment*

■ "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Barbour v. Dynamics Research Corp.,* 63 F.3d 32, 36 (1st Cir.1995) (quoting Fed.R.Civ.P. 56(c)), *cert. denied,* —— U.S. ——, 116 S.Ct. 914, 133 L.Ed.2d 845 (1996). "When presented with a

---

**13.** Plaintiff did not object to this statement of current medical debts.

**14.** As stated later in this opinion, this misrepresentation claim originally was styled as a common law fraud claim. Because of ERISA preemption, however, it will be construed as a claim for breach of fiduciary duty.

**15.** Unfortunately, Jackson's complaint is not a model of clarity. Based on Defendant's motion for summary judgment and Plaintiff's opposition, however, there appears to be a consensus among the parties that the above statement of Jackson's claims is correct. Moreover, the First Circuit

recently held that amendments to complaints in ERISA actions should be liberally permitted. "ERISA is a remedial statute designed to protect the interests of plan participants and beneficiaries.... Courts should not hasten to employ technical rules of pleading and practice to defeat that goal." *Degnan v. Publicker Industries, Inc.,* 83 F.3d 27, 30 (1st Cir.1996). This principal favors liberal construction of Plaintiff's pleadings. *Fitzgerald v. Codex Corp.,* 882 F.2d 586, 589 (1st Cir.1989) (abandoning "theory of the pleadings" doctrine limiting legal claims to those plead in complaint; sufficient if facts plead entitle claimant to relief under some legal theory).

motion for summary judgment, courts should pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Rivera–Cotto v. Rivera*, 38 F.3d 611, 613 (1st Cir. 1994). "To succeed [in a motion for summary judgment], the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

■■■■ "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'" *Barbour*, 63 F.3d at 37 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986)). "There must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.'" *Rogers*, 902 F.2d at 143 (quoting *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511) (citations and footnote in *Anderson* omitted). The Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Barbour*, 63 F.3d at 36.

B. *Legal Limitations on Claims Under ERISA §§ 409, 502(a)(2) and 502(a)(3)*

 1. *Suit for Damages on Behalf of Terminated Plan*

■■■ According to governing Supreme Court precedent established in *Mertens v. Hewitt Assoc.*, 508 U.S. 248, 255, 113 S.Ct. 2063, 2067–68, 124 L.Ed.2d 161 (1993) and *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142, 105 S.Ct. 3085, 3090, 87 L.Ed.2d 96 (1985), ERISA does not permit beneficiaries to bring damage actions against fiduciaries on their own behalf. Rather, beneficiaries must seek damages on behalf of the plan as a whole. Here, because the Local 42 Fund is defunct, there is no plan on whose behalf Jackson may sue. Defendants contend that ERISA offers no relief for an aggrieved beneficiary seeking damages from a plan that has been terminated.

■■■ Defendant correctly states the governing law of ERISA with respect to damages suits brought by beneficiaries on their own behalf. ERISA's civil enforcement provisions permit plan participants to bring actions either "for appropriate relief under section 409 [29 U.S.C. § 1109]," ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), or "to enjoin any act or practice which violates any provision of this title or the terms of the plan, or to obtain other appropriate equitable relief to redress such violations or to enforce any provisions of this title or the terms of the plan." *Id.* § 502(a)(3), 29 U.S.C. § 1132(a)(3). In turn, ERISA § 409, 29 U.S.C. § 1109(a) provides:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. . . .

Construed together, ERISA § 409(a), 29 U.S.C. § 1109(a), and § 502(a)(2), 29 U.S.C. § 1132(a)(2), permit plan participants and beneficiaries to bring actions for damages and equitable relief against Trustees for breach of fiduciary duties.[16]

Such actions can be brought, however, only for relief for the plan itself rather than for beneficiaries individually. Construing this "comprehensive and reticulated statute," *Mertens*, 508 U.S. at 251, 113 S.Ct. at 2066 (citation omitted), the Supreme Court held in

---

**16.** Courts construing ERISA oftentimes refer to the internal statutory designation rather than the sections at which the statute is codified. For ease of reference, the Court hereinafter will refer to 29 U.S.C. § 1109 as ERISA § 409; and 29 U.S.C. § 1132, as ERISA § 502.

*Russell* that actions for breach of fiduciary duty under §§ 409 and 502(a)(2) must be brought in a representative capacity on behalf of the plan. 473 U.S. at 142, 105 S.Ct. at 3090. In that case, a plan participant wrongfully denied benefits sued for extracontractual damages, including compensation for emotional distress and punitive damages, after her contractual benefits due under the plan were reinstated retroactively. *Id.* at 136–37, 105 S.Ct. at 3087–88.[17] Analyzing the text of §§ 409 and 502(a)(2), the Court held that "its draftsmen were primarily concerned with the possible misuse of plan assets, and with remedies that would protect the entire plan, rather than with the rights of an individual beneficiary." *Id.* at 142, 105 S.Ct. at 3090. Accordingly, the Court held that a beneficiary could not state a claim under ERISA §§ 409 and 502(a)(2) unless she alleged some harm to the plan. *Id.*

The Court has similarly construed § 502(a)(3) to prohibit beneficiaries from bringing damages actions on their own behalf. As stated above, that catch-all relief provision enables plan participants to "obtain other appropriate equitable relief." ERISA § 502(a)(3). Refusing to infer from § 502(a)(3) the cause of action rejected in *Russell,* the Court held that a suit for "monetary relief for all losses [a] plan sustained as a result of [an] alleged breach of fiduciary duties" was not available under that provision. *Mertens,* 508 U.S. at 255, 113 S.Ct. at 2068.[18] Section 502(a)(3) provides only for "equitable relief" and a suit to recover plan losses was not "a remedy traditionally viewed as 'equitable,' such as injunction or restitution," but rather sought money damages, which "are, of course, the classic form of legal relief." *Id.; see also Armstrong v. Jefferson Smurfit Corp.,* 30 F.3d 11, 13 (1st Cir.1994) (compensatory damages may not be awarded under ERISA § 502(a)(3)) (citing *Mertens* ); *Drinkwater v. Metropolitan Life*

*Ins. Co.,* 846 F.2d 821, 824 (1st Cir.) (" 'Other appropriate equitable relief[,]' [§ 502(a)(3) ] should be interpreted to mean what it says—declaratory or injunctive relief, not compensatory and punitive damages."), *cert. denied,* 488 U.S. 909, 109 S.Ct. 261, 102 L.Ed.2d 249 (1988).

To fall within the *Russell–Mertens* boundaries, Jackson suggests the following compound remedial scheme. As a first step, he seeks money damages on behalf of the plan from the Trustees for losses caused by breaching their fiduciary duty of prudent plan administration. Once those damages have been awarded to the plan under §§ 409 and 502(a)(2), Jackson seeks restitution of his lost benefits. He seeks this latter form of equitable relief personally under § 502(a)(3).

As Defendants strenuously argue, the first and most obvious obstacle to the Plaintiff's proposed remedy is the termination of the Local 42 Fund. Due to the Merger Agreement, there is no longer a plan on behalf of which Jackson may seek damages. According to the Trustees, their decision to terminate the Local 42 Fund insulates them from a damages suit for breach of fiduciary duties. They also argue that this result obtains even if their fiduciary duty breach caused the financial distress that led to the plan's termination.

The Court does not accept Defendants' reasoning. Read to its logical endpoint, the argument would hold that fiduciaries whose breach renders a plan insolvent and thus cause it to terminate immunize themselves from ERISA liability. "ERISA is a remedial statute designed to fashion anodynes that protect the interests of plan participants and beneficiaries." *Degnan v. Publicker Industries, Inc.,* 83 F.3d 27, 30 (1st Cir.1996). As the Supreme Court recognized in a post-*Mertens* opinion very recently handed down, "[g]iven these objectives, it is hard to imagine why Congress would want to immunize

---

**17.** In contrast to the plaintiff in *Russell,* Jackson does not seek extracontractual damages (e.g., pain and suffering or punitive damages) but only requests restitution of benefits due under the plan.

**18.** Of course, beneficiaries may bring an action on behalf of a plan for losses sustained by a plan under §§ 409 and 502(a)(2) and *Russell.* The

difficulty in *Mertens* was that a non-fiduciary was sued for knowing participation in a breach of fiduciary duties. Because §§ 409 and 502(a)(2) apply only to fiduciaries, a damages action against non-fiduciaries could not lie under those sections. *Mertens,* 508 U.S. at 253, 113 S.Ct. at 2066–67.

breaches of fiduciary obligation that harm individuals by denying injured beneficiaries a remedy." *Varity Corp. v. Howe,* —— U.S. ——, ——, 116 S.Ct. 1065, 1078, 134 L.Ed.2d 130 (1996). Defendants' crabbed interpretation of §§ 409 and 502(a)(2) would leave plan beneficiaries such as Jackson remediless in the face of the most aggravated breaches of fiduciary duty that cause a plan to fail.

Where a breach of fiduciary duties has caused a plan's termination,[19] there is precedent for an equitable remedy under ERISA to protect beneficiaries of a plan which was terminated as a result of misuse and mismanagement of plan assets by plan fiduciaries. In *Amalgamated Clothing & Textile Workers Union, AFL–CIO v. Murdock,* 861 F.2d 1406 (9th Cir.1988), an ERISA plan fiduciary, Murdock, caused pension funds to be used in a "greenmail" transaction, whereby funds were invested in companies in which Murdock held substantial shares of stock to induce those companies to repurchase the stock at a premium to fend off a hostile takeover. *Id.* at 1408. Through this transaction, Murdock netted a substantial surplus for the fund from which he personally profited by causing the plan to be terminated, after paying out actuarially vested benefits, and having the excess distributed to him. *Id.* at 1409.

The Ninth Circuit held that Murdock breached his fiduciary duty of loyalty by putting plan funds to his own purposes. *Id.* at 1410–11. However, the defendant claimed that once the vested benefits had been paid and the plan terminated, the beneficiaries had no remedy for this breach of fiduciary duty. *Id.* Rejecting this argument, the court declared that "[u]nder the defendants' interpretation ... a fiduciary can breach one of ERISA's fundamental duties, gain millions of dollars in profits as a result of the breach, and walk away from the plan with impunity." *Id.* at 1416. The court continued "[i]t would

be ironic if the very acts of benefit payment and plan termination that allegedly resulted in a fiduciary personally obtaining ill-gotten profits should also serve to deny plan beneficiaries standing. ..." *Id.* at 1418.

The court held that the trust's amendment and termination were not obstacles to equitable relief. Simple distribution of ill-gotten benefits to the plan would not have remedied the breach because, under the terms of the terminated trust, the profits recycled back to the breaching fiduciary. Therefore, the court caused an equitable distribution of the profits among prior beneficiaries. The equitable remedy of a constructive trust was held available under §§ 409(a) and 502(a)(2)–(3) to achieve this result. *Id.* at 1417–19; *see also Waller v. Blue Cross of California,* 32 F.3d 1337, 1339–40 (9th Cir.1994) (constructive trust remedy available under ERISA though not employed in case at bar); *Reid v. Gruntal & Co., Inc.,* 760 F.Supp. 945, 951 (D.Me. 1991) ("Section 1132(a)(3) [ERISA § 502(a)(3)] includes constructive trusts among its contemplated remedies."). Important for present purposes, the Ninth Circuit also noted that "[h]ad the assets been insufficient to satisfy its actuarial obligations, presumably the ill-gotten profits could have been returned to the plan to enable the plan to satisfy fully its obligations." *Murdock,* 861 F.2d at 1411 n. 9.

The remaining Local 42 Fund assets currently are held in escrow by a third party, the Bakers' Fund, the successor to the Local 42 Fund by virtue of the Merger Agreement.[20] The Bakers' Fund currently holds approximately $50 thousand of the former Local 42 Fund's assets, which have not been expended in settling the outstanding claims of former plan participants. A constructive trust is available at common law to require third parties to surrender property acquired with notice of a breach of trust. *See Restatement of Restitution* § 168 (1937) ("Where a

19. Of course, Defendants challenge Jackson's claim that a breach of fiduciary duty caused the plan to terminate. At this point, however, the Court addresses Defendants' legal argument assuming a breach of fiduciary duty. Later in this opinion, the Court deals with Defendants' summary judgment claims as to the absence of such a breach.

20. This is not to suggest that the Bakers' Fund is directly liable for the debts of the Local 42 Fund. Indeed, the Bakers' Fund explicitly disclaims such liability in the terms of the Merger Agreement. Merger Agreement ¶ 13.

person holding property in which another has a beneficial interest transfers title to the property in violation of his duty to the other, the transferee holds the property subject to [that] interest, unless he is a bona fide purchaser."); *id.* at § 172 (defining bona fide purchaser as one who acquires property for value without notice of breach of trust giving rise to constructive trust); *id.* at § 174 ("[A] person has notice of facts giving rise to a constructive trust if he knows the facts or should know them.").

Here, the Bakers' Fund executed the Merger Agreement with notice of the Local 42 Fund's unsatisfied claims and Jackson's suit against the plan. Merger Agreement, schedules B & D. As a result, if this Court were to determine that Trustees Morin and Moran transferred assets to the Bakers' Fund without paying outstanding obligations in violation of their fiduciary duty to plan beneficiaries, any remaining fund assets would be subject to a constructive trust.

■■■ This Court must determine whether a constructive trust, or another equitable remedy derived therefrom, is available to protect beneficiaries of a plan which was terminated as a result of mismanagement by the plan fiduciaries. This Court is not bound by traditional trust principles in fashioning a proper equitable remedy under ERISA:

> [T]he law of trusts often will inform, but will not necessarily determine the outcome of, an effort to interpret ERISA's fiduciary duties. In some instances, trust law will offer only a starting point, after which courts must go on to ask whether, or to what extent, the language of the statute, its structure, or its purposes require departing from common-law trust requirements.

*Varity,* —— U.S. at ——, 116 S.Ct. at 1070. The catch-all provisions of ERISA § 502(a)(2)–(3) provide this Court with some flexibility in fashioning an adequate remedy. *Id.* at ——, 116 S.Ct. at 1079 ("[C]ourts, in fashioning 'appropriate' equitable relief, will keep in mind the special nature and purpose of employee benefit plans....") (citations omitted).

■■■ Such a remedy could include equitably reviving the Local 42 Fund, or creating a new trust altogether, to hold and distribute a damage award if it were found at trial that trustee mismanagement caused the plan to fail. As the purpose of the Local 42 Fund was to provide medical and health benefits to participants, ERISA authorizes this Court to create a trust or other equitable tool to make plan beneficiaries whole. *See Murdock,* 861 F.2d at 1417–19; *Restatement of Trusts (Second)* § 108 (1959) ("If a trust is created and there is no trustee or if the trustee, or one of several trustees, ceases for any reason to be a trustee, a new trustee can be appointed ... by a proper court[.]"). In doing so, a court must "take account of competing congressional purposes, such as Congress' desire to offer employees enhanced protection for their benefits, on the one hand, and, on the other hand, its desire not to create a system that is complex that administrative costs, or litigation expenses, unduly discourage employers from offering welfare benefit plans in the first place." *Varity,* —— U.S. at ——, 116 S.Ct. at 1070. To construe ERISA otherwise would give an equitable remedy to plan beneficiaries when the trustees breach a fiduciary duty so as to diminish a plan's assets but no remedy at all when trustees are so inept as to cause the trust's demise.

### 2. *Personal Restitution*

This holding makes available only the first part of Jackson's requested relief. Although he seeks damages on behalf of the fund and a constructive trust to accept such damages, Jackson also requests personal restitution on his own behalf for lost benefits. Here, Plaintiff stands on shakier ground as the remedy he seeks—essentially monetary relief for unpaid medical claims—appears at first blush to have been foreclosed by the Supreme Court. *See Mertens,* 508 U.S. at 255, 113 S.Ct. at 2067–68 (monetary relief for losses sustained is not available under ERISA § 502(a)(3) as "appropriate equitable relief.").

■■■ In a very recent opinion, *Varity Corp. v. Howe, supra,* the Supreme Court cleared this obstacle. There, fiduciaries of an ERISA plan had misled a group of employees as to the financial health of a new

plan to which they were fraudulently induced to transfer. When the new plan failed, the employees sought reinstatement to their former plan as an equitable remedy under § 502(a)(3). —— U.S. at ——, 116 S.Ct. at 1067–69. Distinguishing prior precedent, the Court held that "[t]he words of [§ 502(a)(3) ]—'appropriate equitable relief' to 'redress' any 'act or practice which violates any provision of this title'—are broad enough to cover individual relief for breach of a fiduciary obligation." *Id.* at ——, 116 S.Ct. at 1076. Thus, individual participants may sue directly for a breach of fiduciary duty so long as they seek an equitable remedy. *Id.* at ——, 116 S.Ct. at 1079.

■ Of course, restitution is an equitable remedy. *Mertens,* 508 U.S. at 248, 113 S.Ct. at 2064–65 ("[T]he text of ERISA leaves no doubt that Congress intended 'equitable relief' to include only those types of relief that were typically available in equity, such as injunction, mandamus, and restitution."); *Restatement of Restitution* ch. 9 intro. note (1937) ("A person entitled to restitution is entitled, in an appropriate case, to a remedy by a proceeding in equity, and not merely to a remedy by a proceeding at law."). In equity, a trust beneficiary could "compel the trustee to redress a breach of trust." *Restatement (Second) of Trusts,* § 199 (1959).

■ In the ERISA context, the equitable remedy of restitution includes compelling trustees to pay benefits due. Indeed, in reasoning later upheld by the Supreme Court in *Varity,* the Eighth Circuit held that restitution included paying benefits to retirees who wrongfully were lured away from the solvent benefit plan:

> The relief awarded includes payments of money that plaintiffs would have received if they had remained members of the [former plan], but we do not think these payments can properly be characterized as 'damages,' and thus unavailable under Section 502(a)(3). Rather, we view the payments as restitution. Equity will treat that as done which ought to have been done. Or, to put it in words that fit the present case more precisely, equity will disregard that which ought not to have been done.... Payments of past-due ben-

efits are analogous to awards of back pay in Title VII cases, relief uniformly regarded as equitable. *Cf. Mertens,* [508 U.S. at 255, 113 S.Ct. at 2067–68] (analogizing the remedies available under ERISA to those available under Title VII).

*Howe v. Varity Corp.,* 36 F.3d 746, 756–57 (8th Cir.1994) (Arnold, C.J.), *aff'd,* —— U.S. ——, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996); *see also In re Unisys Corp. Retiree Medical Benefit "ERISA" Litig.,* 57 F.3d 1255, 1269 (3d Cir.1995) (holding that "restitutionary reimbursement of back benefits" is form of equitable relief available under § 502(a)(3)), *cert. denied sub nom., Unisys Corp. v. Pickering,* —— U.S. ——, 116 S.Ct. 1316, 134 L.Ed.2d 470 (1996); *Schwartz v. Gregori,* 45 F.3d 1017, 1022–23 (6th Cir.) (characterizing award of back pay for retaliatory discharge under ERISA as equitable restitution under § 502(a)(3)), *cert. denied,* —— U.S. ——, 116 S.Ct. 77, 133 L.Ed.2d 36 (1995).

■ Here, Jackson alleges that he has wrongfully been deprived of benefits due under the plan through Defendants' breach of fiduciary duty. One alleged breach of duty consists of failing to pay outstanding claims before terminating the Local 42 Fund. In effect, as Defendants' rightly argue, this is a claim that the Merger Agreement itself violated the Trustees' duty to Jackson as set forth in the trust instrument, as the Trustees did not provide that his benefits be paid with remaining Local 42 Fund assets prior to the merger. If this conduct is found to constitute a breach of fiduciary duties, then restitution is available to compel the Bakers' Fund or the Trustees personally to pay Jackson's past-due benefits.

## C. Breach of Fiduciary Duties

The foregoing analysis to some extent has put the cart before the horse. Holding that remedies would be available should a breach of fiduciary duties be found, the Court now must address Defendant's argument on summary judgment that no breach of fiduciary duty occurred here. Jackson alleges three types of breach by the Trustees: (1) failing to monitor Tyrrell's administration of the Local 42 Fund so as to permit it to

become inadequately funded; (2) improperly terminating the plan and transferring its remaining assets without satisfying outstanding liabilities; and (3) failing to disclose, and misrepresenting, the fund's dire financial straits.

### 1. *Prudent Person Standard Generally*

■ ERISA plan trustees "are held to the strict fiduciary standards set out in § 404(a)(1) [29 U.S.C. § 1104(a).]" *Clark v. Washington Teamsters Welfare Trust,* 8 F.3d 1429, 1432 (9th Cir.1993). ERISA defines a fiduciary as one who exercises discretionary authority in the management of the plan or its assets or with respect to plan administration. ERISA, 29 U.S.C. § 1002(21)(A); *Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enterprises, Inc.,* 793 F.2d 1456, 1459–60 (5th Cir.1986), *cert. denied,* 479 U.S. 1089, 107 S.Ct. 1298, 94 L.Ed.2d 154 (1987).[21] It is undisputed that the fund Trustees and Tyrrell were fiduciaries with respect to the Local 42 Fund.

■ Duties imposed on ERISA fiduciaries are found at ERISA, § 404 [29 U.S.C. § 1104(a) ], which provides in pertinent part:
(a) Prudent man standard of care. (1) Subject to sections 403(c) and (d) [addressing treatment of plan assets and termination] . . ., a fiduciary shall discharge his duties with respect to a plan solely in the interests of the participants and beneficiaries and—(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; (B) with the care, skill, prudence, and diligence under the circumstances that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; . . . and (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title.

29 U.S.C. § 1104(a). This familiar "prudent person" standard is derived from trust law, and common law trust principles are applied where consistent with ERISA's statutory scheme to give content to fiduciary duties in particular circumstances. *See Varity,* —— U.S. at ——, 116 S.Ct. at 1070 ("[ERISA] fiduciary duties draw much of their content from the common law of trusts, the law that governed most benefit plans before ERISA's enactment."); *Bixler v. Central Pennsylvania Teamsters Health & Welfare Fund,* 12 F.3d 1292, 1299 (3d Cir.1993) ("Congress relied upon the common law of trusts to define the general scope of trustees' and other fiduciaries' authority and responsibility.") (citation, internal quotation marks and brackets omitted). Thus this Court will apply both ERISA precedent and the common law of trusts in deciding Defendants' motion for summary judgment with respect to fiduciary liability.

### 2. *Failure to Monitor Trust Administration*

■ Jackson first alleges that the Trustees' failure to supervise Tyrrell and TCI caused the Local 42 Fund's financial distress and eventual termination. ERISA allows a fiduciary to delegate a fiduciary duty. *Willett v. Blue Cross and Blue Shield of Alabama,* 953 F.2d 1335, 1340 (11th Cir.1992); *see also* 29 U.S.C. § 1105(c) ("The instrument under which a plan is maintained may expressly provide for procedures . . . for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities (other than trustee responsibilities) under the plan."). Also, the Local 42 Fund trust expressly permits the Trustees to delegate duties of plan administration. Declaration of Trust, art. II, § 10(b).

■ However, "[s]uch delegation is not absolute. . . . A fiduciary who attempts to delegate a duty to another person or entity may nonetheless be liable for the breach of that duty[.]" *Willett,* 953 F.2d at 1340. A

---

**21.** Specifically, ERISA, 29 U.S.C. § 1002(21)(A) provides:

[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or control respecting management of

such plan or exercises any authority or control respecting management or disposition of its assets . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

fiduciary can be held liable for the acts or omissions of his delegate if, *inter alia,* "he has knowledge of a breach by such other fiduciary [or delegate], unless he makes reasonable efforts under the circumstances to remedy the breach." ERISA, 29 U.S.C. § 1105(a)(3) (establishing liability for co-fiduciaries); *id.* at § 1105(c)(2)(B) (making named fiduciaries liable for breach by delegate according to § 1105(a)(3)).

■ Notwithstanding a proper delegation of fiduciary duties, therefore, a delegating fiduciary retains an obligation to oversee and monitor the activities of his delegate. In *Willett,* Blue Cross and Blue Shield terminated the insurance of the employees of an employer who failed to pay premiums timely. 953 F.2d at 1338–39. Under the insurance contract, the employer was responsible for giving its employees notice of changes in insurance coverage but had failed to inform them of a termination in coverage for non-payment of premiums. *Id.* at 1339. As a result, several employees incurred significant medical expenses for which no insurance coverage was provided. *Id.*

■ The court held that Blue Cross and Blue Shield was a plan fiduciary that had delegated its duty to keep beneficiaries informed of changes in benefits to the employer. *Id.* at 1341. This delegation did not absolve the fiduciary of its duty to monitor trust administration:

> Section 1105(c)(2) clearly provides that the delegation of a fiduciary duty does not end forever the delegating fiduciary's responsibility for ensuring that the duty is discharged. Under ERISA, a fiduciary must always be prepared to reassume a delegated fiduciary duty when it becomes apparent to the fiduciary that the party responsible for performing the duty has breached its obligation. [ERISA, 29 U.S.C.] § 1105(c)(2); *id.* at § 1105(a). A fiduciary who becomes aware that a co-fiduciary has breached a fiduciary duty to plan benefi-

ciaries may not escape liability by simply casting a blind eye toward the breach.

*Id.* If Blue Cross and Blue Shield had notice of the delegate's breach of its duty to inform beneficiaries of the suspension of health benefits, the insurer could be held liable for medical expenses incurred by employees after the breach. *Id.* at 1341–43.

There is ample additional precedent, both in ERISA and the common law of trusts, in support of a fiduciary's duty to supervise persons or entities to whom trust administration has been delegated. *See Leigh v. Engle,* 727 F.2d 113, 135 (7th Cir.1984) (holding that ERISA fiduciaries who are responsible for selecting and retaining close business associates as plan administrators, have "duty to monitor appropriately the administrators' actions."); *Sandoval v. Simmons,* 622 F.Supp. 1174, 1215–16 (C.D.Ill.1985) (delegating ERISA fiduciary retains duty to monitor plan administration); *Restatement (Second) of Trusts* §§ 184, 224 (1959) (establishing duty to use "reasonable care" to prevent co-fiduciary from committing breach of trust and establishing liability for improper delegation of duties of trust administration).

Here, there is admissible evidence that the Trustees abdicated their duty to administer the trust to Tyrrell, or, in the alternative, failed to remedy a breach of trust by Tyrrell once they became aware of his various administrative shortcomings. As the DOL Report describes,[22] from 1985 onward the Trustees were informed of "cash flow" problems at the trust and were aware of delays in paying premiums to the plan's insurer, UL-LICO. DOL Report at 8–9. Eventually, Tyrrell's nonpayment of premiums led to ULLICO's eventual termination of coverage in January 1987. *Id.* at 8–9. Almost immediately afterward, in February 1987, the plan became self-insured. From that point onward the plan began to amass liabilities exceeding its assets such that, at the point of termination, it had only approximately $200

---

22. No party has objected to the competency of the DOL Report as evidence on summary judgment. The court therefore assumes, but reserves for decision at trial, the question of whether the

DOL Report may be admitted as substantive evidence pursuant to Fed.R.Evid. 803(8) (public reports exception to hearsay rule) or any other provision.

thousand in reserves to satisfy approximately $1 million in outstanding liabilities.[23]

A reasonable inference could be drawn from the DOL Report that the plan Trustees failed to oversee Tyrrell's administration of the Local 42 Fund, even after they were notified of his several lapses in paying insurance premiums. It could further be reasonably inferred that this failure to monitor caused the plan to lose insurance coverage, to become inadequately self-funded, and finally to terminate due to financial insolvency.[24]

■ While the record evidence on this point is sparse, it is sufficient to present a genuine issue of material fact with respect to the Trustees failure to make "reasonable efforts to remedy [Tyrrell's] breach" of fiduciary duty. 29 U.S.C. § 1105(a)(3). Defendants have presented no competent evidence tending to negate the inference that the plan's failure was due to their negligent monitoring of Tyrrell. Indeed, the only countervailing evidence comes from Defendant Morin's affidavit, which states:

> In 1989, the Trustees of the Local 42 Fund undertook an effort to secure the merger of the Local 42 Fund into a larger health and welfare fund. Because of the relatively small number of participants in the Local 42 Plan and the then ever rising health care costs, the Trustees of the Local 42 Fund believed that such a merger was the only way to insure continued health insurance coverage for participants and their families.

Morin Aff. ¶ 2. No mention whatsoever is made of Tyrrell's failure to pay premiums and the consequent need to self-insure as potential contributing causes of the merger. Defendants' complete failure to counter any of the facts presented in the DOL Report with contrary competent evidence dooms its motion for summary judgment. Thus, Jackson's claim on behalf of the Plan under ERISA, §§ 409(a) and 502(a)(2), for damages for Defendants' failure to monitor Tyrrell's administration of the plan will proceed to trial.

### 3. Breach of Fiduciary Duty Regarding Merger

Jackson also claims that the Defendants' decision to merge the Local 42 Fund with the Bakers' Fund without satisfying outstanding medical claims breached fiduciary duties under ERISA, § 502(a)(3). Specifically, Jackson argues that Defendants should have used remaining plan funds to satisfy claims, to the extent practicable, before the termination and thus breached their duties of care and loyalty. Defendants counter that the Merger Agreement was a reasonable response to the plan's financial distress, served the greater good of the participants, was consistent with the plan documents and trust instrument, and therefore was not a breach of fiduciary duty.

■ From the outset, it is important to note that ERISA's fiduciary duties generally do not govern a plan sponsor's decision to terminate a welfare plan. "Employers or other plan sponsors are generally free under

---

**23.** Defendants attempt to minimize the significance of this disparity between the Local 42 Fund's pre-merger reserves and outstanding liabilities by arguing that Jackson's personal losses were minuscule as compared to the Fund's overall medical care liability. Def.'s Mot. for Summ.J. at 10. Defendants' appear to forget that Jackson seeks damages on behalf of the plan as a whole under ERISA §§ 409(a) and 502(a)(2). That his personal losses were small as compared to the Fund's overall liabilities is not relevant to this claim. Defendants also argue that the full extent of any loss caused by their breach of fiduciary duty was $44,376, the amount of overpayment to Tyrrell by the Trustees for his administrative services. This figure comes from an overly narrow reading of the DOL Report which discloses several other potential breaches of fiduciary duty that may have contributed to the far

greater losses incurred by the plan during the period of self-insurance.

**24.** Defendants argue that the DOL Report never expressly finds that the loss in insurance coverage and other plan losses were due to a breach of fiduciary duties. The report certainly could not draw any conclusions with respect to the termination because it was written two years prior to the merger. However, the absence of any conclusions as to breach of fiduciary duties does not mean that this inference could not reasonably be drawn from the facts presented in the report. Indeed, the Department of Labor evidently believed that such an inference was proper as evidenced by its subsequent ERISA civil enforcement action brought against Defendants for breach of fiduciary duties.

ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans." *Curtiss–Wright Corp. v. Schoonejongen,* — U.S. —, —, 115 S.Ct. 1223, 1228, 131 L.Ed.2d 94 (1995); *see also American Flint Glass Workers Union, AFL–CIO v. Beaumont Glass Co.,* 62 F.3d 574, 579 (3d Cir.1995) ("A decision to terminate a plan is 'unconstrained by the fiduciary duties that ERISA imposes on plan administration.' ") (quoting *Hozier v. Midwest Fasteners, Inc.,* 908 F.2d 1155, 1162 (3d Cir.1990)); *Adams v. Avondale Industries, Inc.,* 905 F.2d 943, 947 (6th Cir.) ("[A] company does not act in a fiduciary capacity when deciding to amend or terminate a welfare benefits plan."), *cert. denied,* 498 U.S. 984, 111 S.Ct. 517, 112 L.Ed.2d 529 (1990). Thus, the Trustees' decision to terminate the Local 42 Fund, in itself, cannot be scrutinized for failure to adhere to ERISA's fiduciary duties.

A distinction must be drawn, however, between the decision to terminate a plan and the manner in which that decision is implemented. Although fiduciary duties do not govern the decision to terminate, courts have held plan trustees subject to fiduciary duties in making post-termination implementation decisions. *See, e.g., Varity,* — U.S. at —, 116 S.Ct. at 1074 (holding that decision to terminate plan not governed by fiduciary duties but fiduciaries' statements about plan future governed by such duties); *Pilkington PLC v. Perelman,* 72 F.3d 1396, 1401–1402 (9th Cir.1995) (employer's choice of annuity provider for pension plan post-termination is subject to ERISA's fiduciary duty of loyalty); *Beaumont Glass Co.,* 62 F.3d at 579 (assuming "once a termination decision is reached, that ERISA's fiduciary duties control the termination procedures."); *Waller,* 32 F.3d at 1342 (employer's choice of annuity providers on basis of maximizing reversion of surplus assets on plan termination can violate ERISA fiduciary duties; employer "acted in a fiduciary capacity when choosing annuity providers to satisfy plan liabilities."); *District 65, UAW v. Harper & Row, Publishers, Inc.,* 670 F.Supp. 550, 555–56 (S.D.N.Y.1987) (holding that ERISA fiduciary standards apply to post-termination decision as to how to allocate benefits). While most of the above-cited decisions apply to termination of pen-

sion plans rather than welfare plans, the reasoning behind these cases is not particular to pension plans. Both are subject to ERISA's fiduciary duties. *See* ERISA, §§ 404(a), 409(a) (applying fiduciary duties to administration of "plan"); 29 U.S.C. § 1002(3) (defining "plan" as either welfare plan or benefit plan, or both).

Therefore, Jackson cannot quibble with the decision to terminate the Local 42 Fund, but he has properly alleged a breach of the fiduciary duties of care and loyalty in the manner in which that decision was carried out. Specifically, Jackson has challenged the Trustees' decision to accept the Bakers' Fund merger proposal, as contrary to the terms of the Declaration of Trust. He argues the implementation of the Local 42 Fund termination violated fiduciary duties spelled out in ERISA, §§ 404 and 409.

ERISA § 404 cross-references § 403(d)(2), which specifies that "[t]he assets of a welfare plan which terminates shall be distributed in accordance with the terms of the plan, except as otherwise provided in regulations of the Secretary [of Labor.]" Because no such regulations have been promulgated, the Local 42 Fund's termination is governed by the Declaration of Trust. In turn, that document provides that in the event of termination, trust funds be applied "so far as is practicable" to trust purposes specified in article II, section 4(b), chief among which is the provision of specified health and medical benefits. Declaration of Trust, art. V, § 3 (termination provision). Any balance "which cannot be so applied" may be transferred to another qualified trust which "as in the opinion of the trustees" will "best effectuate" the purposes of the Trust. Furthermore, article II, section 4(b) of the trust vests discretion in the Trustees to determine the nature and extent of benefits to be provided. *Id.* art II, § 4(b) (purpose of trust "to provide such benefits ... as the Trustees in their sole discretion may deem fit and prudent").

■ A discretionary decision of the trustees to balance the interests of different classes of beneficiaries is governed by an "arbitrary and capricious" standard of review. *See Firestone Tire & Rubber Co. v.*

*Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989); *Caterino v. Barry,* 8 F.3d 878, 883 (1st Cir.1993) ("As is well-established, courts set aside [a] trustee management decision only if it is arbitrary and capricious in light of the trustees' responsibility to all potential beneficiaries.") (citation and internal quotation marks omitted); *Mahoney v. Board of Trustees,* 973 F.2d 968, 969 (1st Cir.1992) (decision to increase size of retirement pension so as to benefit still working persons over retirees not arbitrary in light of higher contributions of current employees). "The touchstone of 'arbitrary and capricious' conduct is unreasonableness." *Clark,* 8 F.3d at 1432.

Defendants argue that their decision to cut off participants with outstanding claims was not arbitrary as it redounded to the benefit of the plan as a whole. In other words, it was not arbitrary and capricious to sacrifice these outstanding claims in order to ensure future insurance coverage for the greater number of participants without claims in the pipeline.

The fiduciary duty plainly at issue here is impartiality. *See Varity,* — U.S. at —, 116 S.Ct. at 1078 ("The common law of trusts [made applicable to ERISA §§ 404, 409] recognizes the need to preserve assets to satisfy future, as well as present, claims and requires a trustee to take impartial account of the interests of all beneficiaries.") At common law, this duty was applied most often to protect the interests of successive beneficiaries (e.g., income and principal beneficiaries). *See Dennis v. Rhode Island Hosp. Trust Nat'l Bank,* 744 F.2d 893, 896 (1st Cir.1984) ("[S]ettled law requires [the trustee] to act impartially, 'with due regard' for the 'respective interests' of both the life tenant and the remainderman.") (quoting *Restatement (Second) of Trusts* § 232 (1959)); 2A William F. Fratcher, *Scott on Trusts,* § 183, at 558–59 (4th ed. 1987) ("Ordinarily, the question of the duty of impartiality of the trustee arises where there are successive beneficiaries.") This duty also applies where a trustee is required to act impartially vis a vis beneficiaries with present interests. Fratcher, *supra,* § 183, at 559 ("The question of the duty of impartiality of the trustee may arise, however, with respect to simultaneous as well as successive beneficiaries, that is, with respect to several beneficiaries who are entitled to share in the [same interest].").

The Local 42 Fund Trustees cut off a group of the most vulnerable participants—the ones who had been ill and previously filed claims—from benefits in order to effect the merger with the Bakers' Fund. Jackson and other beneficiaries listed on schedule D of the Merger Agreement all had incurred unpaid medical expenses prior to the merger. In order to "save" the plan, the Trustees cut a deal with the Bakers' Fund that provided for participants to have prospective health and medical coverage but denied benefits due to those persons with claims already in the pipeline. In effect, the Trustees favored beneficiaries without outstanding claims at the expense of the beneficiaries listed on schedule D.

Defendants point out they provided for Jackson and other similarly-situated beneficiaries to the extent that the Bakers' Fund was required to use their "best efforts" to settle their claims. The Merger Agreement however did not legally obligate the Bakers' Fund to expend all remaining Local 42 Fund assets (i.e., Bakers' Fund assets by virtue of the agreement) in compromising outstanding claims, even on a *pro rata* basis.[25] Merger

---

25. A helpful case illustrates the application of the duty of impartiality in circumstances analogous to the present litigation. In *In re Joint Eastern and Southern Districts Asbestos Litig.,* 878 F.Supp. 473 (E. & S.D.N.Y.1995) (Weinstein, J.), *aff'd in part and vacated in part on other grounds,* 78 F.3d 764 (2d Cir.1996), the trustees of the Manville trust, which was established to pay out present and future claims of those injured by exposure to asbestos, learned that the trust's assets were woefully inadequate to pay anticipated claims and sought instructions. The court held that the proper way with which to deal with the shortfall was to effect a *pro rata* distribution of the remaining assets such that each present and future claimant would be paid a percentage share of the value of his claim. *Id.* at 493–95. In support of its solution, the court quoted a venerable equity treatise:

Whenever several persons are entitled to participate in a common fund, or are all creditors of a common debtor, equity will award a distribution of the fund, or a satisfaction of the claims, in accordance with the maxim, Equality is equity; in other words, if the fund is not

Agreement ¶ 10–11. While the Bakers' Fund offered all creditors 25 cents on the dollar to settle, it was not legally responsible for doing so. As a result, it lacked an incentive to negotiate terms with individual medical providers should the settlement offer prove insufficient. Also, it stood to receive a windfall—all remaining assets—should the providers fail to accept the settlement, or should the prediction as to outstanding claims or future liability be overstated.

▬▬▬ As already stated, the Local 42 Fund Declaration of Trust provided that "so far as practicable" assets remaining at termination would be expended to provide health benefits for plan participants. ERISA § 404 imposes duties of care and loyalty, including impartiality, that prohibit trustees from allocating plan assets inequitably. At a minimum, this duty prohibits trustees from placing the primary burden of a funding shortfall on a small number of sick beneficiaries. On the present record, however, the Court cannot determine whether a more equitable *pro rata* distribution of assets was feasible. Thus, the Court on summary judgment cannot determine whether or not the Trustees acted arbitrarily in entering the Merger Agreement with the terms there provided. In any event, there certainly is a genuine issue of material fact on this question which precludes summary judgment for Defendants.

### 4. *Trustees' Misrepresentations*

Jackson also alleges that Defendants breached a fiduciary duty by failing to inform him of the fund's dire financial straits and by assuring him that his benefits would be paid after it became clear that the fund would be unable to meet its obligations.

▬▬▬ While this claim originally was plead as common law fraud (Count IX), ERISA's broad preemption provision forecloses Jack-

son's common law fraud claim. 29 U.S.C. § 1144(a) (superseding any state laws that "relate to" an employee benefit plan); *see also Carlo v. Reed Rolled Thread Die Co.*, 49 F.3d 790, 794 (1st Cir.1995) (holding preempted common law negligent misrepresentation claim regarding scope or existence of benefits under ERISA plan); *Vartanian v. Monsanto Co.*, 14 F.3d 697, 699–700 (1st Cir.1994) (state common law misrepresentation claim preempted by ERISA). To the extent that his common law fraud claim is preempted, Jackson requests that it be restyled as an ERISA claim for breach of fiduciary duties. Consistent with ERISA's remedial goals, this Court will construe his fraud claim as one for breach of fiduciary duties under 29 U.S.C. § 1109, § 1132(a)(3). *See Degnan*, 83 F.3d at 30 (permitting amendment to pleading on appeal to restyle common law misrepresentation as ERISA claim for breach of fiduciary duty); *Fitzgerald v. Codex Corp.*, 882 F.2d 586, 589 (1st Cir.1989) (permitting state law wrongful discharge claim to be construed as ERISA retaliatory discharge claim so long as plaintiff pleaded sufficient factual allegations to provide relief "under *some* viable legal theory.").[26]

▬▬▬ "Lying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA[.]" *Varity*, —— U.S. ——, 116 S.Ct. at 1074 (quoting *Peoria Union Stock Yards Co. Retirement Plan v. Penn Mut. Life Ins. Co.*, 698 F.2d 320, 326 (7th Cir.1983)); *see also In re Unisys Corp.*, 57 F.3d at 1261 ("[I]n the exercise of [his] duties, the fiduciary may not materially mislead those to whom the duties of loyalty and prudence are owed."); *Restatement (Second) of Trusts* § 173 (1957) ("The trustee is under a duty to the beneficiary to give him upon his request ... complete and accurate information as to the nature and amount of the trust

---

sufficient to discharge all the claims upon it in full, or if the debtor is insolvent, equity will incline to regard all the demands as standing upon an equal footing, and will decree a *pro rata* distribution or payment. *Id.* at 527 (quoting John Norton Pomeroy, *A Treatise on Equity Jurisprudence* § 407 (1881)). Following the law of trusts, which is equitable in nature, the court held that a *pro rata* distribution

based on a percentage of the value of the present and future claims afforded impartial and fair treatment to all claimants. *Id.* at 533–35.

26. Similarly, Plaintiff's claim for fraudulent conveyance under Massachusetts law (Count XI) is preempted. Since there is no ERISA analog to this claim, it must be dismissed.

property."). "Put simply, when a plan administrator speaks, it must speak truthfully." *Fischer v. Phila. Elec. Co.*, 994 F.2d 130, 135 (3d Cir.), *cert. denied,* 510 U.S. 1020, 114 S.Ct. 622, 126 L.Ed.2d 586 (1993).

 Jackson has adduced evidence sufficient to raise a genuine issue of material fact as to whether he was affirmatively misled by Trustee Morin once he became aware that the fund was having difficulty paying claims. On several occasions, he spoke with Trustee Morin to express his concerns about the fund's payment of his medical bills. According to Jackson, he was continually reassured, and his attorney received correspondence in July 1991 from TCI informing him that the fund fully intended to pay Jackson's bills. According to Morin, however, the plan already was in serious trouble by that time, Morin Aff. ¶ 2–4, and other evidence suggests that the plan was on the brink of failure when these reassurances were made. Jackson also claims that he would have made other arrangements had he known the true extent of the fund's financial difficulties. This evidence is sufficient to withstand Defendants' motion for summary judgment on the question of their breach of the duty of candor in their dealings with Jackson.[27]

### D. *Other Issues*

#### 1. *Motion to Confirm Settlement*

The Bakers' Fund has filed a motion to confirm a settlement reached with Jackson that releases it from direct liability for breach of fiduciary duty or any other claim to Jackson for his medical expenses (Docket No. 159). Under the settlement scheme, stipulated to in Court on October 30, 1995, the Bakers' Fund would pay Jackson a *pro rata* share (25%) of his claims immediately. Under certain circumstances outlined in the stipulation, he could return to court to receive any outstanding balance of his unpaid claims, which currently are approximately $8,740. No provision in the settlement agreement requires payment of attorneys fees out of the Bakers' Fund.

The stipulation also included an express reservation of Jackson's right to pursue equitable remedies against the Local 42 Fund and its remaining assets held by the Bakers' Fund as holder of the plan assets in dispute. This understanding was memorialized by the following colloquy:

[Attorney for Jackson]: [T]he only other point I would clarify for the record is that this preservation of Mr. Jackson's claims against Local 42 include the ability to go for equitable relief against the funds held by the Bakers' Fund.

The Court: Yes, that's why the stipulation exists.

Tr. 10/30/95 at 6. Thus, the stipulation and settlement only terminates direct claims against the Bakers' Fund for its breach of fiduciary duty as a potential successor trustee or third-party beneficiary contract claims based on the Merger Agreement. Jackson retains the right to pursue claims against the Bakers' Fund as a constructive trustee of the proceeds of the Local 42 Fund still held by the Bakers' Fund, not only for purposes of obtaining restitution of the plan benefits but also for payment of attorneys fees. The Bakers' Fund remains in the action only to the extent that a constructive trust may be imposed upon it to satisfy a judgment against Defendants.[28]

#### 2. *Plaintiff's Motion for Summary Judgment as to Medical Expenses*

 Plaintiff has filed a motion for summary judgment on Count I seeking to establish conclusively the Local 42 Fund's liability for the medical expenses that he incurred during the fund's period of self-insurance. He has produced several exhibits verifying his claims as well as portions of the record in the state court collection action brought by Dr. Sachs. In addition, Jackson also points

---

**27.** There is no evidence that Trustee Moran made similar misrepresentations. However, it has not been argued here that Trustee Moran would not share liability as a co-fiduciary for Morin's statements.

**28.** Of course, no double recovery would be permitted. If Jackson eventually receives full benefits from the settlement with the Bakers' Fund, he could not also obtain restitution from Defendants for the same amount. Any funds provided pursuant to settlement would be offset against recovery from Defendants or vice versa.

to Defendants' answer to his amended complaint in which they admit that Jackson's medical services should have been paid by the Local 42 Fund, with the exception of Dr. Sachs. Amended Complaint ¶ 14, 16; Answer ¶ 16. With respect to Dr. Sachs, Jackson incurred medical expenses of $2,017.28 for having his teeth removed prior to his kidney transplant and has presented evidence that this was a medical necessity covered by the Local 42 Fund plan. Pl.'s Mot. for Summ.J. ex. 18. There is an outstanding state judgment establishing liability for claims made for Dr. Sachs' services in the amount of $2,017.28, including costs and interest. Also, Local 42 has admitted that it owes $6,722.80 to Medical Group, Inc. in Schedule D to the merger agreement. See also Docket No. 108, ¶ 10. Defendants' only answer to Jackson's motion is that Jackson's claim was made against the Local 42 Fund, which no longer exists, and thus judgment cannot enter against it. As this opinion already has demonstrated, however, this Court has the power to order restitution against the trustees or to revive the Local 42 Fund should it be shown at trial that Defendants' breach of fiduciary duty caused it wrongfully to be terminated or to have wrongfully deprived Jackson of benefits.

Because Defendants have presented no evidence assailing Plaintiff's substantive claim as to his medical expenses, Plaintiff's motion is **ALLOWED** in the amount of $8,740.08, plus interest and attorneys fees,[29] with payment awaiting resolution of the fiduciary duty claims at trial.

### 3. *Payment of Attorney's Fees from Former Local 42 Funds Held in Escrow*

■■■■■■ Plaintiff has filed pleadings raising the issue of an award of attorney's fees should he be successful at trial. Attorney's fees are available to the prevailing party under ERISA, 29 U.S.C. § 1132(g). "[I]n this circuit, an award of attorney's fees under ERISA is not virtually automatic, but remains discretionary with the trial judge."

*Gray v. New England Telephone and Telegraph Co.*, 792 F.2d 251, 259 (1st Cir.1986). In exercising this discretion, the Court considers five factors:

(1) the degree of bad faith or culpability of the losing party; (2) the ability of such party to personally satisfy [sic] an award of fees; (3) whether such award would deter other persons acting under similar circumstances; (4) the amount of benefit to the action as conferred on the members of the pension plan; and (5) the relative merits of the parties' positions.

*Id.* at 257–58. Attorney fees may be awarded against a plan fiduciary in an equitable enforcement action or against the plan itself in an action to recover plan benefits. *See Brown v. American Mobil Power Corp.*, 64 F.3d 1397, 1404–1405 (9th Cir.1995) (allowing attorney's fees to plaintiff in appeal of action against plan trustee who breached fiduciary duties); *Spain v. Aetna Life Ins. Co.*, 13 F.3d 310, 312–13 (9th Cir.1993) (allowing recovery of attorney fees against plan administrator in equitable action); *White v. Jacobs Engineering Group Long Term Disability Benefit Plan*, 896 F.2d 344, 352 (9th Cir.1990) (permitting award of reasonable attorney's fees against benefit plan).

■■■■ At this juncture, however, Plaintiff's request for attorney's fees is premature. Any determination as to an award of attorney's fees must be reserved until trial. At that time, this Court will have a complete record upon which to make a fee determination employing the five factors listed above.

### 4. *Jury Trial*

■■■■ A jury demand has been made in this case. However, ERISA actions are equitable and therefore no right to trial by jury is provided by statute or the Seventh Amendment to the Constitution. *Borst v. Chevron Corp.*, 36 F.3d 1308, 1323–24 (5th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1699, 131 L.Ed.2d 561 (1995); *Vartanian v. Monsanto Co.*, 880 F.Supp. 63, 72

---

**29.** The Bakers' Fund has requested leave to file its own motion for summary judgment with respect to this issue and to reopen discovery. The stipulation of settlement requires plaintiff to return to court to seek payment of any additional medical bills. At that point, any dispute can be resolved, and the Court will determine whether discovery should be reopened or whether the Bakers' Fund should be bound by the judgment against the Local 42 Fund.

(D.Mass.1995). That monetary relief is sought also does not mandate a jury trial as Jackson requests restitution rather than damages. *Borst,* 36 F.3d at 1324. Thus, the Court shall serve as the finder of fact at trial.

### IV. *Conclusion*

Based on the foregoing, the Court ***DE-NIES*** Defendants' motion for summary judgment (Docket No. 108) on all counts and ***ALLOWS*** Plaintiff's motion for summary judgment (Docket No. 155) as to Count I. Except as stated herein, Defendant's motion to confirm settlement or in the alternative to re-open discovery (Docket 159) is ***DENIED.***