**Charles MCFADDEN, Plaintiff,**

v.

**R&R ENGINE & MACHINE CO., et al., Defendant.**

**No. 5:97CV2783.**

United States District Court,
N.D. Ohio,
Eastern Division.

June 30, 2000.

Thomas A. Skidmore, Akron, OH, for Charles McFadden, plaintiff.

Brent L. English, Law Offices Of Brent L. English, Cleveland, OH, Steven B. Beranek, Middleburg Hts, OH, for defendants.

### MEMORANDUM & ORDER

O'MALLEY, District Judge.

Plaintiff Charles McFadden[1] originally brought this action against two defendants: (1) his ex-employer, R & R Engine & Machine Company ("R & R"); and (2) the Central Reserve Life Insurance Company ("Central Reserve"), which provided a group health insurance policy to R & R employees. McFadden alleged that Central Reserve refused to reimburse him for a substantial amount of health care costs he incurred during and after his employment at R & R. The basis for Central Reserve's refusal was that, just after McFadden incurred the health care costs in question, it canceled R & R's group health insurance policy for R & R's nonpayment of premium; the cancellation was retroactive to before McFadden incurred the costs of fighting his cancer.

In Count 1 of his second amended complaint, McFadden asserted the defendants each violated the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* McFadden asked the Court to, inter alia: (a) declare that he is a beneficiary of the group health insurance policy; (b) declare that both defendants

---

1. Because Mr. McFadden died during the course of these proceedings, the Court granted as unopposed a motion to substitute Vonnie McFadden as plaintiff. For clarity, however, the Court refers to the plaintiff in this opinion as Charles McFadden.

were fiduciaries under ERISA and violated their fiduciary duties; (c) order the defendants to pay his medical bills; and (d) order the defendants to reinstate him as a beneficiary under the group health insurance policy. McFadden also brought the following additional claims: (Count 2) breach of fiduciary duty, in violation of ERISA, against Central Reserve; (Count 3) breach of employment condition and fiduciary duty, against R & R; (Count 4) estoppel, against R & R; (Count 5) intentional infliction of emotional distress, against R & R; (Count 6) estoppel, against Central Reserve; (Count 7) intentional infliction of emotional distress, against Central Reserve; and (Count 8) bad faith refusal to pay insurance benefits, against Central Reserve.

Earlier, the Court granted Central Reserve's motion to dismiss in part, and the Court dismissed Counts 6, 7, and 8 on the basis of ERISA preemption. Marginal Order at 1 (Jan. 29, 1999). The Court also earlier granted in part R & R's motion for partial summary judgment, granting judgment as a matter of law in favor of R & R on Counts 3, 4, and 5.[2] Order at 2 (Apr. 16, 1999). McFadden then moved to voluntarily dismiss with prejudice all of his remaining claims against Central Reserve, which the Court granted. The result of these rulings was that only Count 1 remained pending, and only against R & R.

On April 19–20 and May 21, 1999, the Court held a bench trial to resolve McFadden's remaining claim. Pursuant to Fed. R.Civ.P. 52(a), the Court now issues its findings of fact and conclusions of law. For the reasons explained below, the Court finds that McFadden is entitled to an equitable judgment against R & R on Count 1 of the complaint. The Court **ORDERS** R & R to pay McFadden restitution, as follows: (1) R & R shall pay $43,567.71 to the Central Reserve "master policy" trust; and (2) the trustees of that trust must then pay out that same amount to McFadden. **This is a final, appealable order**, from which post-judgment interest shall run, pursuant to 28 U.S.C. § 1961.

Finally, the Court **ORDERS** the parties to file post-judgment briefs on the propriety of an award of attorney's fees and prejudgment interest, as discussed in section III of this opinion, below.

## I.

After carefully reviewing all of the evidence submitted by the parties, the Court makes the following findings of fact.

### A. McFadden's Employment and Participation in the ERISA Health Care Plan.

McFadden was born in 1942. He served in the United States Army in Vietnam, and was honorably discharged in November of 1969. In 1988, R & R hired McFadden to work in the parts supply department, as an hourly worker. During McFadden's tenure, R & R made available to all employees participation in a group health insurance policy provided by Central Reserve (the "R & R Health Care Plan"). For the first few years of his employment with R & R, McFadden declined participation in the R & R Health Care Plan because he obtained health care insurance through his ex-wife's employer. In early 1993, however, McFadden elected to participate in the R & R Health Care Plan. To enable McFadden's participation, R & R: (1) provided McFadden with "sign-up" forms; (2) forwarded the completed forms to Central Reserve; and (3) forwarded to McFadden the Health Care Plan certificate booklet and hospital identification cards subsequently issued by Central Reserve.

During the latter half of 1996, Central Reserve charged R & R a monthly premium of $139.50 for each employee participating in the R & R Health Care Plan. Of

---

**2.** In the same Order, the Court denied McFadden's cross-motion for partial summary judgment against R & R on Count 1.

this amount, the employee was responsible for a monthly premium co-payment of 35%, or $48.84. All employees except McFadden had their monthly co-payments deducted automatically from their paychecks. McFadden, however, with R & R's permission, wrote a check each month to R & R for his co-payment. Specifically, McFadden received paychecks from R & R on a weekly basis, every Friday, and made his co-payments to R & R mid-month, usually just before receiving his third paycheck for that month. Thus, for example, McFadden paid his co-payments on March 19, 1996 (two business days after he received his third paycheck of that month), June 14, 1996 (the same day he received his second paycheck of that month), and August 16, 1996 (the same day he received his third paycheck of that month); through September of 1996, he never made a payment later than the 19th of any given month. McFadden made his co-payments by check, personally delivering the check each month to R & R's president and controller, Mary Jean Menke. R & R would deposit McFadden's co-payment checks into its own general account, as opposed to depositing them into a special escrow account or signing them over to Central Reserve. R & R concedes that, until September of 1996, McFadden timely paid all of his monthly co-payments.

On Monday, September 16, 1996, however, McFadden took a vacation day from work and had plans to meet his fiancé. When he was late, his fiancé went to check on him; finding him unconscious, he was rushed to Akron City Hospital. It was quickly discovered that McFadden had lung cancer, and he underwent surgery that night. He was released from the Akron City Hospital on September 24, 1996, the same day he began chemotherapy and radiation treatment.

During McFadden's stay in the hospital, Mary Jean Menke and her ex-husband, Leland Menke (R & R's vice-president), visited him.[3] No one broached in any way the subject of McFadden's health insurance premium co-payment for the month of September of 1996. After the hospital released McFadden on September 24, 1996, McFadden visited R & R and informed the Menkes that, on doctor's orders, he had to terminate his employment. One or both of the Menkes accepted McFadden's notice of termination, and assured McFadden that R & R would work with him to take the steps necessary to assure his medical coverage would remain active.

On Friday, October 11, 1996, R & R sent to McFadden his "last paycheck," covering the pay period ending Saturday, October 5, 1996. The gross amount of this check was $336.00, which represented only unpaid, accrued vacation pay. In addition to deductions for taxes, however, R & R deducted $69.25 for "½ Sept. premium" and $140.00 for "Oct. premium."[4] Mary Jean Menke explained to McFadden that these deductions represented his payments to R & R for continued health insurance coverage as an ex-employee, pursuant to COBRA.[5] As such, McFadden did not write a

---

3. Mary Jean Menke and McFadden both testified that they were fairly good friends before this lawsuit was filed, and remained so even until some time after McFadden learned that the Menkes' actions had likely cost him his health insurance coverage. The Menkes attended McFadden's wedding in October of 1996.

4. The gross amount of $336.00 represented payment for 4 vacation days of 8 hours each, at the rate of $10.50 per hour. Although R & R *wrote* that it was deducting $69.75 for "½ Sept. premium," it actually deducted $69.25,

for a total premium co-payment deduction of $209.25.

5. The evidence showed that, because McFadden was no longer an R & R employee as of late September of 1996, R & R did not simply deduct the $48.84 *co-payment* for each monthly premium. Rather, R & R deducted from McFadden's final paycheck the *full* monthly premium of $139.50 for the month of October, and the pro rata amount for the two weeks in September after McFadden went to the hospital. (It is unclear why R & R rounded up this deduction to $140.00, instead of $139.50.) Up until October of 1996, McFad-

separate check to R & R in September for his monthly health insurance premium co-payment. On October 31, 1996, McFadden gave Mary Jean Menke a check for $140.00, representing his COBRA health insurance coverage premium for November of 1996. For reasons explained below, R & R returned this money to McFadden on December 28, 1996. In addition, on May 19, 1997, R & R sent a check to McFadden for $209.25, representing re-payment of the money R & R had deducted from his October 5, 1996 paycheck for his September and October, 1996 health insurance coverage premiums under CO-BRA. Apparently, although McFadden's prior counsel received this "refund" check for $209.25, it was never cashed.

### B. R & R's Relationship with Central Reserve.

The co-payments McFadden gave to R & R every month for health insurance coverage helped pay for a group health care insurance policy provided to R & R by Central Reserve. The mechanism through which Central Reserve provided the health care insurance involved creation of a trust. Specifically, Central Reserve issued a "master policy" to a trust, with the "International Professional Group, Inc." as the trustee; employers, like R & R, could then apply to Central Reserve to become a trust beneficiary. Exhibit 122–A at 1. Once the employer passed Central Reserve's underwriting analysis and became a beneficiary, the employees would become "certificate-holders," becoming the ultimate recipients of the health insurance coverage. Because it was the employer who was the trust beneficiary, however, only the employer could tender premium payments for the coverage—an employee could not tender his share of the premium directly to Central Reserve.[6] Under this arrangement, the total monthly premium payment actually due from R & R to Central Reserve varied every month, depending on the fluctuating number of covered R & R employees (and their dependants). For example, R & R's total September, 1996 monthly group policy premium for the R & R Health Care Plan was $3,051.12; the July, 1996 total was $2,911.62.

The Central Reserve group health care insurance policy stated that the total monthly premium was due from R & R on the first of each month; thus, payment of the monthly premium for insurance coverage for the month of September of 1996 was due September 1, 1996. The policy provided that "premium payment[s] must be received at the Home Office to be considered paid." Exhibit 104–A at 43.[7] The policy further stated, however, that there existed a grace period:

> For Medical Insurance, a Grace Period of thirty-one (31) days will be provided for the payment of each premium falling due after the first premium. If the premium due has been paid prior to the expiration of the Grace Period, the coverage will be deemed to have continued in force during the Grace Period. If

den did not know that the full insurance premium per employee was $139.50, or that his co-payment represented only 35% of that amount. The Court notes here that the testimony of Mary Jean Menke regarding the subject of R & R's deductions from McFadden's October, 1996 paycheck—and, indeed, on virtually all other subjects about which she testified—was self-serving, purposefully ambiguous, and riddled with incredible assertions.

6. While R & R alone had the responsibility to make premium payments and collect any co-payments from employees, it had no responsibility to interpret or apply the policy, or otherwise determine the validity of employees' claims made for health insurance coverage. At trial, principal officers of both R & R and Central Reserve asserted they were *not* the "administrator" of R & R's health care plan.

7. Exhibit 104–A is essentially a summary of the insurance policy, which is Exhibit 122–A. Thus, the provision that "premium payment[s] must be received at the Home Office to be considered paid" is also contained in Exhibit 122–A at page 108.21. Because, during trial, the parties referred to Exhibit 104–A and not 122–A when discussing policy terms, the Court does so also, in this opinion.

any premium due, after payment of the first premium, is not paid before the end of the Grace Period, the insurance coverage will automatically terminate at the end of the last day for which the premium has been paid. No notice of termination is required.

*Id.* Essentially, this provision simply provided that R & R could make the full premium payment to Central Reserve up to 31 days late, and the policy would remain in force. Thus, although the September, 1996 premium for R & R's group health insurance policy was due in Central Reserve's office on September 1, 1996, R & R could make payment as late as October 2, 1996, with no loss of coverage.

In addition to the Grace Period defined in the policy itself, Central Reserve made a practice of extending to R & R, in writing, a "second grace period" or "administrative grace period." Specifically, whenever R & R's premium payment was past due, Central Reserve would send R & R a notice containing the words "IMPORTANT REMINDER." This notice first reminded R & R that "if the premium is not received within the 31–day grace period ..., your coverage will automatically terminate at the end of the last day for which the premium has been paid." Exhibit 29 at 1. The notice also stated that "[s]hould your coverage lapse, [Central Reserve] will *consider* reinstating your coverage (without medical underwriting) if premium in full is *received* in [Central Reserve's] Home Office no later than [the tenth day of the following month]." *Id.* (emphasis in original). Thus, R & R's September monthly premium was due September 1, 1996; the first grace period ended on October 2, 1996; and the second, optional, administrative grace period ended October 10, 1996.[8]

Although R & R's premiums were due "in advance," R & R did not collect from its employees their co-payments in advance. That is, even though R & R's group policy premium for coverage during the month of September of 1996 was due on September 1, R & R did not complete the deduction of its employees' September co-payments from their paychecks until the *end* of September. Given that McFadden usually made his co-payments to R & R mid-month, McFadden thus usually made his co-payments earlier than his co-workers. Routinely, R & R would then aggregate all of the employees' co-payments, add its own share, and send the total premium to Central Reserve.

R & R habitually made its monthly premium payments late. In fact, R & R routinely made its payments during the second grace period, and sometimes even later. Despite her awareness in September of 1996 that McFadden had incurred and was continuing to incur health care costs to fight his cancer, Mary Jean Menke followed her normal practice of delaying R & R's premium payments. Mary Jean Menke claims she mailed R & R's September, 1996 premium to Central Reserve some time shortly after 5:00 p.m. on October 9, 1996, by depositing the payment into a mailbox at the Akron, Ohio Post Office, Firestone Branch. Menke admitted that the lateness of R & R's premium payment had nothing to do with the fact that McFadden had not yet given her his September co-payment. Menke testified she believed that, even using ordinary mail, Central Reserve would receive her payment by October 10, 1996. Her theory was that the Post Office would retrieve mail from its mailbox at 5:30 p.m. on October 9, 1996 and deliver the payment to Central Reserve on October 10, 1996.

8. Central Reserve did, in fact, send an "IMPORTANT REMINDER" notice to R & R on September 16, 1996, stating that it had not received R & R's September, 1996 premium payment and that, if it did not receive payment within the 31–day grace period, it would "*consider* reinstating ... coverage (without medical underwriting) if premium in full is *received* in [Central Reserve's] Home Office no later than 10/10/96." Exhibit 29 at 1 (emphasis in original). Mary Jean Menke testified that it was her understanding that the second grace period was "10 additional days," but this is clearly not what the notices said.

Menke also testified that she believed Central Reserve had no right to terminate the policy if it received R & R's payment on or before the tenth day of the month following the premium due date. That is, even though Menke repeatedly received notices from Central Reserve stating that, if payment was received after the 31–day grace period, R & R's coverage automatically *lapsed,* Menke believed that R & R's coverage would automatically *resume* if Central Reserve received payment on or before the tenth day of the following month.

The Court finds, however, that Mary Jean Menke's testimony regarding her mailing of the September, 1996 premium is not credible, and is inconsistent with other evidence indicating that she did not place the premium payment in the mail until, at the earliest, sometime *after* the final pickup at the Firestone Branch on October 9, 1996. The envelope containing R & R's September, 1996 premium payment was postmarked October 10, 1996, and it was not stamped "received" by Central Reserve until October 15, 1996. Indeed, representatives of Central Reserve testified credibly that Central Reserve did not receive R & R's September, 1996 premium payment until well after October 10, 1996. Because it did not receive timely payment of premiums, Central Reserve canceled R & R's group health insurance policy for non-payment of premium.

By October 10, 1996, Central Reserve knew McFadden had started to receive medical treatment for his cancer. Central Reserve admits that part of the reason it canceled R & R's policy for non-payment of premium was to avoid paying the costs of McFadden's treatment. Although Central Reserve had, many times before, received R & R's monthly premium payment during the second grace period, Central Reserve had never before refused to reinstate R & R's policy, nor even undertaken an underwriting review. Indeed, if Central Reserve actually received full premium payment before the second grace period expired, it had an unwritten policy of *not* canceling coverage or undertaking an underwriting review, as long as it had no evidence that substantial claims had arisen during the interim. But it was because of the possibility of this contingency—that is, the arising of intervening claims after coverage had officially lapsed—that Central Reserve clearly reserved to itself in writing the *right* to cancel coverage in such circumstances. Central Reserve took advantage of this right in order to avoid paying for McFadden's medical costs, after R & R's late premium payment gave it a valid excuse to do so. *See Coleman v. Nationwide Life Ins. Co.,* 969 F.2d 54, 57 (4th Cir.1992), *cert. denied,* 506 U.S. 1081, 113 S.Ct. 1051, 122 L.Ed.2d 359 (1993) (holding that an ERISA health insurance plan properly terminated automatically on the last day of the grace period for payment, retroactive to the date through which coverage had been paid for).

Akron City Hospital informed McFadden on October 15, 1996, that he did not have health insurance coverage, and McFadden relayed this information to Mary Jean Menke. Menke expressed surprise and assured McFadden that he "shouldn't worry, all bills would be paid." Menke then immediately wrote a letter to Central Reserve pleading for reinstatement of the health insurance policy, stating that "I consider coverage my legal and moral responsibility for my employees." [9]

Shortly thereafter, McFadden received a letter from Central Reserve confirming that R & R's group health insurance policy had lapsed for non-payment of premium, leaving him uninsured. Mary Jean Menke also received a letter from Central Reserve, stating that the R & R policy had "automatically terminated for non-payment of the September premium." Exhibit 89 at 1. Central Reserve returned R & R's

9. This lawsuit, and the aggressiveness with which it was defended, reveals plainly that these words were empty.

September premium payment and explained the requirements for reinstatement. *Id.* One of the requirements was for each employee to submit a "Statement of Good Health." Mary Jean Menke called McFadden and declared she intended to get the policy reinstated; on November 1, 1996, at her direction, McFadden filled in a "Statement of Good Health," on which he acknowledged his recent illnesses. Menke apparently attempted to fulfill all of Central Reserve's other requirements for reinstatement, including sending to Central Reserve a check for the September, October, and November policy premium (in the amount of $7,852.93). Unsurprisingly, on November 21, 1996, Central Reserve declined reinstatement "[i]n accordance with [its] underwriting guidelines." Exhibit 95 at 1. R & R subsequently obtained a group health insurance policy from another insurance company, with coverage effective December 1, 1996.[10]

On December 4, 1996, Mary Jean Menke sent to McFadden a letter asking him to sign an enclosed "COBRA form." Exhibit 31 at 1. The enclosed form was titled "Notice to employee/dependent and election of continuation of health coverage." On the form, Menke had typed that McFadden had notified R & R of the "qualifying event," being "termination," on "October 7, 1996." Exhibit 32 at 1. McFadden refused to sign the "COBRA form," believing at this point that R & R was acting in bad faith, either against him or the insurance company, or possibly both. Mary Jean Menke testified at trial that she purposely filled in the COBRA form with a false termination date as a qualifying event, hoping to manipulate Central Reserve into providing coverage for McFadden.

The reason Menke wanted McFadden to sign a "COBRA form" was that the R & R

group health care policy contained provisions allowing for "Continuation of Coverage." Exhibit 104–A at 58–63. Under the heading "COBRA Eligible Employees," the policy stated that "[a]n insured person may become eligible for Continuation of Coverage, entirely at his/her own expense, if he/she loses coverage under this group plan because of any of these Qualifying Events: ... the employee's termination of employment for reasons other than gross misconduct." *Id.* at 61. When Menke sent the "COBRA form" to McFadden, she believed that McFadden might be able to obtain health insurance coverage under these provisions of the R & R Health Care Plan. In fact, however, Menke was wrong, because the policy had lapsed retroactive to before McFadden's employment terminated. R & R thus concedes that McFadden's failure to sign the COBRA form is a non-issue, because there existed no health care coverage for which McFadden could obtain continuation.

## C.  McFadden's Medical Costs.

█ During the initial two days of the bench trial, the parties argued the issues of what amounts of medical expenses McFadden incurred, and what portion of those amounts would have been covered under the R & R health care policy. These issues included questions of deductible amounts, co-pay percentages, whether McFadden's medical providers were "preferred," and the mitigation-related question of whether McFadden could have obtained medical care through the Veterans' Administration. On the last day of trial, however, the parties reached an agreement regarding virtually all of these issues.[11] Specifically, the parties stipulated that, in pertinent part: (1) subsequent to the time he was first hospitalized in September of 1996 and through the end of

10.  Mary Jean Menke testified that she did not return to her employees the health insurance co-payments that R & R automatically deducted from their paychecks in September, October, and November of 1996, even though the employees never received health insurance coverage for those months.

11.  It is not completely clear whether the parties' stipulations moot the mitigation issue; R & R stipulated that the amounts listed *infra* were valid, covered medical expenses, but R & R was silent as to whether it continued to assert McFadden could have mitigated his expenses by obtaining medical care through

1998, McFadden incurred medical expenses of $46,111.46 that would have been covered under the policy;[12] (2) Central Reserve had negotiated discounts with some of McFadden's medical providers, so that it would not have actually paid $46,111.46 to McFadden's medical providers; (3) if McFadden had been eligible for insurance coverage from September 1, 1996 through November 30, 1998 (a period of 18 months), Central Reserve would have paid to McFadden's medical providers the discounted amount of $25,556.97, and the medical providers would have considered themselves paid in full; and (4) if McFadden had been eligible for insurance coverage for 18 months, he would have had to pay 18 months × $140 premium/month = $2,520.00.[13]

## II.

Based on the findings of fact recited above, the Court now enters the following conclusions of law.

> the Veteran's Administration ("VA"). In any event, the Court concludes that R & R did not carry its burden of proving that McFadden could, in fact, have obtained from the VA medical care for his covered illnesses, or could have avoided liability for any certain portion of his medical expenses. The burden is on R & R to show McFadden failed to mitigate, and to what degree, and R & R did not make any such showing. See Willoway Nurseries v. Curdes, 1999 WL 820784 at *5 (Ohio Ct.App. Oct 13, 1999) (" '[m]itigation is an affirmative defense in Ohio,' placing the burden of proof on defendant at trial to show that the plaintiff's failure to mitigate was … unreasonable") (citing Young v. Frank's Nursery & Crafts, Inc., 58 Ohio St.3d 242, 569 N.E.2d 1034, 1037 (1991)). For example, R & R did not offer any evidence of the VA's policy regarding definition of covered medical expenses, eligibility of veterans, whether waiting periods or pre-existing condition provisions apply, and so on.
>
> 12. The parties offered this stipulation on the last day of trial, May 21, 1999. On February 13, 2000, the Court granted McFadden's motion for leave to submit evidence of additional covered medical expenses that he incurred after trial and before his death. On March 3, 2000, McFadden submitted evidence that he incurred an additional $8,849.85 in medical expenses on December 18, 1999. Under the insurance policy in question, however, CO-

In Count 1, McFadden asserts that R & R breached the fiduciary duties it owed to him under ERISA, and that R & R should be ordered to provide him with the medical benefits he would have received if R & R had timely made its September, 1996 premium payment. R & R asserts three reasons why McFadden's claim for payment of medical benefits must fail. First, R & R insists it did not owe or breach any fiduciary duty. Second, R & R insists that, even if it breached a fiduciary duty, it did not breach any such duty owed *to McFadden*. And third, R & R asserts that, even if it breached a fiduciary duty it owed to McFadden, McFadden is still not entitled to any recovery. The Court finds each of these arguments unavailing.

### A. R & R Owed and Breached a Fiduciary Duty.

During the course of this litigation, R & R has waffled regarding whether it owed a

> BRA coverage could extend, at maximum, to 36 months. Exhibit 104–A at 61. McFadden's COBRA coverage, then, could extend, at maximum, only until October 1, 1999. Because McFadden incurred the additional medical expenses after this deadline, the evidence is irrelevant.
>
> 13. In fact, this last stipulation is slightly incorrect. The monthly health insurance premium that McFadden would have had to pay under the policy's COBRA provisions was 102% of $139.50, or $142.29—not $140.00. See Exhibit 104–A at 62, ¶ 10 ("[a]ll future premium [for a COBRA-eligible employee] will be billed on the Employer's group premium billing statement at 102% of the usual group health premium rate"). The stipulation is also incorrect regarding the amount of premium McFadden would have had to pay for 26 months of coverage (the stipulation says 26 months × $140.00 premium/month = $3,640.00). Given McFadden's Social Security disability status, however, the premium would have increased after month 18 to "150% of the usual group health premium rate." Id. Because the Court determines below that McFadden is entitled to restitution for only 18 months of lost COBRA coverage in any event, both of these stipulation inaccuracies are inconsequential.

fiduciary duty to the R & R Health Care Plan and/or McFadden under ERISA. In its memorandum in opposition to summary judgment, R & R argued that it had no discretion regarding payment of insurance claims, so it was not a plan fiduciary. Later, however, in its trial brief, R & R "concede[d] it owed a fiduciary duty to the plan and its participants." Trial brief at 3 (citing 29 U.S.C. § 3(21)(A)(iii)). Then, during argument at trial, R & R backed away from this concession and again argued it was not a plan fiduciary. Ignoring the question of whether R & R waived this issue by virtue of its trial brief concession, the Court concludes on the facts that R & R was a plan fiduciary.

ERISA states that a person is a plan fiduciary to the extent that "he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets," or to the extent "he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A). "Congress intended the term ['fiduciary'] to be broadly construed." *Blatt v. Marshall and Lassman*, 812 F.2d 810, 812 (2nd Cir.1987).

▇ In its brief in opposition to summary judgment, as a basis for its position that it did not have any fiduciary duty under the R & R Health Care Plan, R & R stated that

Central Reserve handled all claims, established what was and what was not covered under the plan, and otherwise determined whether to pay claims. R & R's sole function was to collect premium payments from participating employees ..., add the portion of the premium

which it had agreed to pay, and send the premium payments to Central Reserve. Memo in opp. at 5. R & R asserts that it did not have any "discretion" with regard to its "limited" responsibilities, so it was not a fiduciary under the plan.

But R & R construes its responsibilities too narrowly. ERISA provides that if a plan administrator is not designated in the written plan documents—as is the case here—then the plan sponsor is the plan administrator. 29 U.S.C. § 1002(16)(A). The statute further indicates that the plan sponsor is "the employer in the case of an employee benefit plan established or maintained by a single employer." *Id.* § 1002(16)(B)(i). The written plan in this case did not designate a plan administrator. Thus, by virtue of § 1002(16)(A), R & R was the plan administrator, and as such, it was a plan fiduciary. *See* 29 C.F.R. § 2509.75–8, FR 12–Q (1991) (a plan administrator is also a named fiduciary); *Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 62 (4th Cir.1992), *cert. denied*, 506 U.S. 1081, 113 S.Ct. 1051, 122 L.Ed.2d 359 (1993) (concluding an employer was the plan administrator and thus a fiduciary).[14]

This result is not inappropriate. R & R asserts that it did not have any "discretion" with regard to its responsibilities of collecting premium payments from participating employees and sending the premium to Central Reserve, but this assertion is incorrect. R & R exercised the very discretion it claims it did not have when it *chose* when and how to collect and forward premium payments. For example, R & R's repeated choice to take advantage of both the first *and second* Central Reserve grace periods, instead of simply paying the premium on or about when it was first due, certainly increased the likelihood that cancellation for non-payment could occur.[15]

---

14. In response to questioning by the Court, Central Reserve's vice president, Joseph Parente, testified that: (1) the plan documents were "silent as to who the plan administrator is;" and (2) even though different employers applied to become beneficiaries of the "master policy" trust, R & R's Health Care Plan was "not one of those multiple-employer plans."

15. As noted, Central Reserve allowed R & R a second grace period during which it would "*consider* reinstating ... coverage (without medical underwriting)," if premium in full

Furthermore, applicable federal regulations confirm that R & R's responsibilities were discretionary—even to the extent that they created a fiduciary responsibility. The assets of the R & R Health Care Plan, by law, "include amounts . . . that a participant or beneficiary pays to an employer, or amounts that a participant has withheld from his wages by an employer, for contribution to the plan as of the earliest date on which such contributions can reasonably be segregated from the employer's general assets." 29 C.F.R. § 2510.3–102(a). ERISA itself states that a person is a plan fiduciary to the extent that he "exercises any authority or control respecting management or disposition *of its assets.*" 29 U.S.C. § 1002(21)(A) (emphasis added). In this case, R & R not only chose how and when to collect its employees' Health Care Plan premium co-payments, it also controlled and managed those co-payments for a substantial period of time after collection. R & R also made the acutely critical decision of when to join those co-payments with its own payment, and send the full premium to Central Reserve. R & R clearly exercised control over plan assets, so it was a plan fiduciary.

Other courts have also concluded that an employer's collection and management of group health insurance policy premiums made it a plan fiduciary, and that the employer's failure to promptly make premium payments amounted to a breach of fiduciary duty. For example, in *Vespasian v. Sweeney,* 1995 WL 154982 (6th Cir. Apr.6, 1995), the plaintiff employee's "medical claims were denied because of the [employer's] failure to pay premiums to" the company's group health plan insurer. *Id.* at *1. The employer ultimately went bankrupt; having no one else to sue, the plaintiff sought relief from the insurance company for breach of fiduciary duty. The Sixth Circuit Court of Appeals affirmed summary judgment on behalf of the

insurance company, but noted, in dicta: "Unfortunately, [the plaintiff] is left without a remedy against an employer who failed to make insurance payments as promised, *probably in breach of its fiduciary duties under ERISA.*" *Id.* at *6 (emphasis added). This statement by the Sixth Circuit Court of Appeals is at least strong persuasive authority for the proposition that an employer's failure to make timely premium payments for an ERISA health care plan is a breach of the employer's fiduciary duty.

A more pointed example may be found in *Mira v. Nuclear Measurements Corp.,* 107 F.3d 466, 470 (7th Cir.1997). In *Mira,* as in this case, the employer, "contributed two thirds of each employee's monthly [group health insurance policy] premium, while each employee was expected to contribute the remaining third." *Id.* at 469. The employer, "as plan administrator[ ], was obligated to forward the health insurance premiums to [the insurer], in a timely fashion, on behalf of the plan's participants and beneficiaries in order to maintain the health insurance coverage agreed upon." *Id.* When it ran into cash-flow problems, however, the employer in *Mira* diverted these premiums to pay for other things.

Ultimately, the employer in *Mira* resolved its cash-flow problems and "paid all of the past premiums due and all of the employees' health insurance coverage (including [the named plaintiff's]) was reinstated." *Id.* at 470. Furthermore, "all of [the named plaintiff's medical] claims were paid in full." *Id.* Nonetheless, the *Mira* court found that the employer's failure to timely pay the health insurance premiums to the insurer "was a violation of the 'duty of care' standard, for the defendants, as fiduciaries, owed to the plan participants and beneficiaries a duty to act with the 'care, skill, prudence and diligence' of a 'prudent man acting in a like capacity.' "

was received by a date certain. Thus, R & R's exercise of its discretion to take advantage of the second grace period carried with it the real possibility every month of serious conse-

quences—retroactive termination of coverage and non-reinstatement. Unfortunately, it was McFadden who lost R & R's game of "chicken."

*Id.* at 471 (quoting 29 U.S.C. § 1104(a)(1)(B)). Thus, the *Mira* court concluded that the employer's failure to make timely scheduled group health insurance premium payments was a breach of its fiduciary duty—even though this breach did not result in actual harm to the employees.[16]

The same conclusion easily applies to the facts of this case—R & R's failure to timely pay the September, 1996 health insurance premiums to Central Reserve violated its fiduciary duty, owed to McFadden and other plan participants, to act carefully, skillfully, prudently, and diligently to ensure the R & R Health Care Plan participants received the benefits paid for. *See also Shade v. Panhandle Motor Serv. Corp.*, 1996 WL 386611 at *2, *4 (4th Cir. July 11, 1996) (after the plaintiff's employer, "due to an administrative error, ... did not transfer [plaintiff] to its new group health plan," the court awarded the plaintiff medical benefits, noting that "a fiduciary breaches its duty to a plan participant by preventing or interfering with the receipt of benefits to which the participant is entitled"); *Jackson v. Truck Drivers' Union Local 42 Health & Welfare Fund*, 933 F.Supp. 1124 (D.Mass.1996) (concluding that the plan fiduciary had wrongfully deprived the plaintiff of medical benefits and employing a constructive trust to ensure the plaintiff received benefits).

In sum, R & R was a fiduciary under the R & R Health Care Plan, by virtue of its discretionary management of its employees' premium co-payments, and R & R had a fiduciary duty to timely pay health care premiums to Central Reserve. Its failure to make this timely payment was a breach of its fiduciary duty.

Before turning to the question of whether R & R breached a duty it specifically owed to McFadden, the Court addresses an argument R & R made at trial—that is, that the Court cannot find R & R breached any fiduciary duty because its payment of the September 1996 policy premium was not truly untimely. R & R offers a three-pronged argument to support this assertion, but not one of the prongs withstands analysis. R & R argues that: (1) the administrative grace period, or second grace period, was actually *an additional 10 days*, so that the second grace period ended October 12, 1996, not October 10, 1996; (2) Central Reserve did receive R & R's September, 1996 premium payment on or before October 12, 1996, by virtue of the payment having arrived in Central Reserve's post office box; and (3) Central Reserve had a policy of reinstating coverage without medical underwriting if it received the policy premium during the administrative grace period, and it should have followed that policy here.

That the first prong is not true is clearly revealed by the documentary evidence. R & R seizes upon the testimony of Central Reserve's vice president, Joseph Parente, which reveals *his own* confusion regarding whether the administrative grace period ended on the tenth of the month, or ended ten days after the first grace period ended. But Central Reserve's written notice, itself, was unambiguous: Central Reserve wrote it would consider reinstating coverage, without medical underwriting, if the premium was received "no later than 10/10/96." Exhibit 29 at 1. The fact that, because Central Reserve routinely used the tenth of the month as its fixed adminis-

---

**16.** The *Mira* court ultimately found that, because the plaintiff's medical claims were all paid, there could be no monetary liability for the defendants' breach of ERISA. The Court concluded that "even if the defendants did breach the fiduciary duties they owed to the plaintiffs, in violation of ERISA, the [plaintiffs] are not entitled to recovery of damages for that breach absent proof of an actual economic loss." *Id.* at 473 (calling this conclusion an application of the rule, "no harm, no foul"). Unlike *Mira*, however, the instant case is not one of "no harm, no foul." In *Mira*, the plaintiffs sued for "extra-contractual damages" allegedly resulting from the mere *delay* in their receipt of medical benefits; in this case, McFadden received *no* plan benefits, he did suffer actual economic loss, and he sues for restitution of the contractual benefits themselves.

trative deadline, the length of the administrative grace period was sometimes 9 days long and sometimes less, is irrelevant.[17]

That the second prong is not true is also revealed by the documentary evidence. R & R posits that Mary Jean Menke placed the envelope containing the September, 1996 premium payment in the mailbox on Wednesday, October 9, 1996; the envelope was postmarked Thursday, October 10, 1996; it arrived in Central Reserve's post office box, at the latest, on Saturday, October 12, 1996; and, because Monday, October 14, 1996 was a federal holiday, Central Reserve retrieved the envelope on Tuesday, October 15, 1996; stamping it "received" on that date. Accepting this scenario, Central Reserve did arguably receive R & R's September, 1996 premium payment *into its post office box* on or before October 12, 1996. But even accepting R & R's first prong—that the administrative period ended October 12, not October 10— this is still not enough. The policy explicitly provided that "premium payment[s] must be received *at the Home Office* to be considered paid." Exhibit 104–A at 43 (emphasis added). The notice regarding the administrative grace period said the same thing: "[Central Reserve] will *consider* reinstating ... coverage (without medical underwriting) if premium in full is *received* in [Central Reserve's] Home Office no later than 10/10/96." Exhibit 29 at 1 (emphasis in original). Even under R & R's scenario, it concedes that the premium payment did not arrive at Central Reserve's Home Office until October 15, 1996, a result Menke could easily have avoided by using a different means of delivery.

■ Finally, R & R asserts that Central Reserve had historically accepted R & R's late premium payments, without any resulting lapse in coverage, even when R & R sent its payments to Central Reserve several days after the second grace period deadline had passed. R & R also points to Mr. Parente's concession that Central Reserve's internal policy was generally to accept premium payments made within the administrative grace period and leave coverage intact, without undertaking any medical underwriting. R & R insists that Central Reserve was thus somehow estopped from refusing to accept R & R's late September 1996 premium. Again, even accepting the other two prongs of R & R's argument, this third prong must also fail:

> An insurer that has an automatic termination provision in its policy is not presently precluded from making the business decision to accept payment of premiums after the grace period has expired and to treat the policy as an uninterrupted one. The decision to do this, of course, does not alter the terms of the contract, but it certainly works to the benefit of plan participants [and their employers] whose coverage would remain in effect.

*Coleman,* 969 F.2d at 58. In other words, regardless of Central Reserve's history of leniency in accepting late group health insurance premium payments from R & R, Central Reserve remained entitled to rely strictly on the written terms of its policy and notice. Once Central Reserve did not receive R & R's September, 1996 premium payment on or before the end of the first grace period—October 2, 1996—Central Reserve had every right to terminate R & R's policy and reinstate coverage, at Central Reserve's option, only after medical

---

17. The first grace period for the September, 1996 premium payment ended 31 days after September 1, 1996, or October 2, 1996; thus the administrative grace period, which ended October 10, 1996, was only 8 days long. In contrast, the administrative grace period for the January, 1996 premium was 9 days long (February 1–10), and the administrative grace period for the February, 1996 premium was 7 days long (March 3–10). That the varying length of the administrative grace period confused Parente (and Menke) does not alter the clear terms of the agreement between R & R and Central Reserve.

underwriting.[18]

R & R had a fiduciary duty to timely make its September, 1996 premium payment to Central Reserve in such a way as to prevent any loss of coverage. R & R breached this duty when it sent the September 1996 payment to Central Reserve used a method that did not ensure payment receipt until after even the second grace period had ended. R & R's argument that it did not breach this duty is not supported by the evidence, nor by settled principles of law.[19]

## B. R & R Owed and Breached a Fiduciary Duty To McFadden.

■ R & R argues that because McFadden did not timely pay to R & R his health insurance premium co-payment for September of 1996, R & R did not owe any duty *to McFadden* to ensure timely payment of the entire premium to Central Reserve. Essentially, R & R asserts that, because McFadden failed to timely pay his share of the premium, he cannot now hold R & R liable for its additional failure. R & R's counsel stated the essence of its position in closing argument: "if he is seeking equitable relief, ... [McFadden] has to do equity, and part of his obligation was to make his premium payment."

This argument fails for the simple reason that McFadden *did* make his premium payment, and R & R never objected that it was untimely until after McFadden initiated this lawsuit. At the time McFadden entered the hospital and then terminated his employment, Mary Jean Menke assured McFadden, at least twice, that R & R would take the steps necessary to ensure he would continue to receive his health insurance coverage benefits. R & R took action in concordance with these assurances by deducting from McFadden's last paycheck health insurance premium co-payments totaling $209.25. Mary Jean Menke testified that: (1) R & R did not consider McFadden's co-payment late at the time; and (2) the timing of its "receipt" of McFadden's co-payment had absolutely nothing to do with its failure to timely make payment to Central Reserve. Indeed, given that R & R "received" McFadden's co-payment by merely retaining monies it had in its own account, which it owed to McFadden, R & R arguably received McFadden's co-payment well before it deducted them from his last paycheck. In any event, it is clear that R & R's failure of timely payment was not caused by, nor is it excused by, any alleged failure of McFadden. R & R cannot rely on an "unclean hands" theory to avoid equitable liability.

## C. McFadden Can Recover.

In Count 1 of his complaint, McFadden asks, *inter alia,* that the Court order R & R "to pay to the Plaintiff the amount of his medical bills incurred since August 31, 1996 to present or approximately $50,000 as compensation for benefits due and un-

18. The equitable estoppel principles upon which R & R seeks to rely, under the third prong of its argument, are frequently rejected in the ERISA context, usually to the benefit of *employers.* For example, if, upon inquiry from McFadden, R & R had told McFadden on September 21, 1996, that he had valid health care coverage, McFadden could not later rely on this statement to argue that Central Reserve was estopped from denying coverage. *Coleman,* 969 F.2d at 59. The "prohibition against using equitable estoppel to modify the written terms of a plan" applies equally to both employers and employees. *Id.*

19. Earlier, the Court denied R & R's motion to assert two cross-claims against Central Re-

serve, based on promissory estoppel and indemnification/contribution. Order at 1–2 (Jan. 8, 1999). The gist of R & R's proposed cross-claims was that "Central Reserve made a practice of accepting late premium payments from R & R for the group health insurance policy, so that Central Reserve should not have been allowed to cancel the policy for non-payment." *Id.* at 2. Although the Court denied R & R leave to assert the cross-claims because R & R's motion did not meet the standard under Fed.R.Civ.P. 15(a), *id.* at 3–5, the Court's estoppel analysis here strongly suggests that R & R's proposed cross-claim would fail on the merits, in any event.

paid." Second Amended Complaint at 4. McFadden cites 29 U.S.C. § 1132(a)(1)(B) in this Count but, as R & R notes, McFadden also cites in his briefs § 1132(a)(3) as authority for the proposition that he can recover the benefits he seeks. *See* R & R's motion to preclude jury trial at 3 n. 2 (recognizing McFadden's citation of § 1132(a)(3)). Accordingly, the Court must examine whether ERISA allows McFadden to recover his medical benefits under any of the three prongs of § 1132(a)(1–3). *See Jackson,* 933 F.Supp. at 1124 n. 15 (noting that plaintiff's complaint was "not a model of clarity" and proceeding to examine the plaintiff's right to relief under any provision of § 1132 because "ERISA is a remedial statute designed to protect the interests of plan participants and beneficiaries" and "amendments to complaints in ERISA actions should be liberally permitted").

■ As an initial matter, R & R is correct that McFadden cannot recover *damages* under § 1132(a)(1). This provision allows a plan participant to bring an action, inter alia, "to recover benefits due to him under the terms of his plan [and] to enforce his rights under the terms of the plan." § 1132(a)(1)(B). In this case, however, McFadden's ERISA plan is no longer in existence, so he has no "benefits due him under the terms of his plan." *Varity Corp. v. Howe,* 516 U.S. 489, 515, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). Thus, McFadden cannot obtain damages under the authority of subpart (1) of § 1132(a).[20]

■ Furthermore, R & R is correct that McFadden cannot recover *individual damages* under any other subpart of § 1132. It is settled law that, even when plaintiffs prove an ERISA fiduciary breached its fiduciary duties, the plaintiffs "cannot recover in their individual capacities." *Tregoning v. American Comm. Mut. Ins. Co.,* 12 F.3d 79, 83 (6th Cir.

1993), *cert. denied,* 511 U.S. 1082, 114 S.Ct. 1832, 128 L.Ed.2d 461 (1994). The Supreme Court, in *Mertens v. Hewitt Assocs.,* 508 U.S. 248, 255, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993) and *Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 142, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985), held that ERISA does not permit beneficiaries to bring *damage* actions against fiduciaries *on their own behalf.* Rather, beneficiaries must seek damages on behalf of the plan as a whole. The Supreme Court reached this conclusion by examining the statutory language contained in the remaining two subparts of § 1132. ERISA's civil enforcement provisions permit plan participants to bring actions: (1) "for appropriate relief under [29 U.S.C. § 1109]," 29 U.S.C. § 1132(a)(2); or (2) "to enjoin any act or practice which violates any provision of this title or the terms of the plan, or to obtain other appropriate equitable relief to redress such violations or to enforce any provisions of this title or the terms of the plan," 29 U.S.C. § 1132(a)(3). In turn, 29 U.S.C. § 1109(a) provides that

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary . . . .

Construed together, §§ 1109(a) and 1132(a)(2) permit plan participants and beneficiaries to bring actions for damages and equitable relief for breach of fiduciary duties. These actions can be brought,

---

20. ERISA also permits a plan participant to sue a plan administrator who fails to provide copies of plan documents. § 1132(a)(1)(A) & (C). Although there was some evidence that R & R failed to give McFadden certain required notices, McFadden has not asked for relief attributable to any such failure.

however, only for relief for the *plan itself* rather than for beneficiaries individually— *Russell* states that actions for breach of fiduciary duty under these sections must be brought in a representative capacity on behalf of the plan. *Russell,* 473 U.S. at 142, 105 S.Ct. 3085. *See also Richards v. General Motors Corp.,* 991 F.2d 1227, 1231 (6th Cir.1993) (" § 1132(a)(2) (which refers to § 1109) provides for relief only to a plan, not to participants or beneficiaries"); *Vespasian,* 1995 WL 154982 at *3 ("§ 1109 permits recovery in the name of a plan only, and not by its individual participants or beneficiaries").

The Supreme Court has similarly construed § 1132(a)(3) to prohibit beneficiaries from bringing *damages* actions on their own behalf. This section of ERISA, which has been referred to as a "catch-all" relief provision, enables plan participants to "obtain other appropriate equitable relief." § 1132(a)(3). In *Mertens,* the Supreme Court refused to infer from § 1132(a)(3) the cause of action it rejected in *Russell,* holding that a suit for individual "monetary relief for all losses [a] plan sustained as a result of [an] alleged breach of fiduciary duties" was not available under that provision. *Mertens,* 508 U.S. at 255, 113 S.Ct. 2063. Rather, § 1132(a)(3) provides only for "equitable relief."

R & R is incorrect, however, when it asserts that, given the legal landscape under *Russell* and *Mertens,* McFadden has no means available at all to recover medical benefits. In *Varity,* 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130, the Supreme Court examined the ERISA "catch-all" relief provision codified at § 1132(a)(3) and concluded that "Congress did provide remedies for individual beneficiaries harmed by breaches of fiduciary duty." *Id.* at 507, 116 S.Ct. 1065. Specifically, the *Varity* Court concluded that § 1132(a)(3) authorizes "individual [*equitable*] relief for breach of a fiduciary obligation." *Id.* at 510, 116 S.Ct. 1065; *see id.* at 516, 116 S.Ct. 1065 ("[t]he Court holds today that ... 29 U.S.C. § 1132(a)(3), the catchall

remedial provision that directly follows [§ 1132(a)(2) ], provides the individual relief for fiduciary breach that we found to be unavailable under [§ 1132(a)(2) ]") (Thomas, J., dissenting). In reaching this conclusion, the Supreme Court first determined that Congress did not "want to immunize breaches of fiduciary obligation that harm individuals by denying injured beneficiaries a remedy." *Id.* at 513, 116 S.Ct. 1065. Then, examining the means to obtain relief authorized by Congress in § 1132, the *Varity* Court observed:

> The plaintiffs in this case could not proceed under the first subsection because they were no longer members of the [ERISA] plan and, therefore, had no "benefits due [them] under the .terms of [the] plan." [§ 1132(a)(1)(B).] They could not proceed under the second subsection because that provision, tied to § 1109, does not provide a remedy for individual beneficiaries. They must rely on the third subsection [§ 1132(a)(3) ], or they have no remedy at all. We are not aware of any ERISA-related purpose that denial of a remedy would serve.

*Id.* at 515, 116 S.Ct. 1065.

This observation in *Varity* is equally applicable to this case. McFadden cannot proceed against R & R under § 1132(a)(1)(B) because the R & R Health Care Plan is no longer in existence. McFadden cannot proceed against R & R under § 1132(a)(2) because that section does not provide a remedy for individual beneficiaries. If McFadden is to have any remedy at all, it must come under § 1132(a)(3). As the *Varity* Court cautioned, this section allows a court to award "appropriate" equitable relief, and a court must "keep in mind 'the policy choices reflected in the inclusion of certain remedies and the exclusion of others.'" *Varity,* 516 U.S. at 515, 116 S.Ct. 1065 (quoting *Pilot Life,* 481 U.S. at 54, 107 S.Ct. 1549).

This Court has found two cases which identify what equitable relief is "appropriate" in circumstances where an employer-

fiduciary's inaction leaves an employee, who was a participant in an ERISA health care plan, without benefits, despite no fault of the employee. In the first case, *Shade v. Panhandle Motor Serv. Corp.*, 1996 WL 386611 (4th Cir. July 11, 1996), the employer (Panhandle) "terminated its employee group health plan with Blue Cross and implemented a self-insurance plan.... However, due to an administrative error, Panhandle did not transfer [the plaintiff] to· its new group health plan." *Id.* at *2. As a result, the plaintiff was left without medical benefits to pay the $161,000 costs of his liver transplant.

The *Shade* court first concluded that Panhandle had breached a fiduciary duty to the plaintiff because it had "prevent[ed] or interfer[ed] with the receipt of benefits to which the participant [was] entitled." *Id.* at *4. The Court then ruled that a "fiduciary that breaches the fiduciary duties owed a plan participant is *personally liable* 'to make good to such plan any losses to the plan resulting from each such breach, . . . and shall be subject to such other equitable or remedial relief as the court may deem appropriate.'" *Id.* (citing 29 U.S.C. § 1109(a)) (emphasis added). The court concluded that "the appropriate remedy was to restore [plaintiff] to the position he would have occupied but for Panhandle's breach of its fiduciary duty." *Id.* (citing *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir.1985)). Accordingly, the *Shade* court ordered the employer to pay the plaintiff an amount equal to all his unpaid medical expenses, minus the insurance premium co-payments that the plaintiff would have had to pay Panhandle's group health plan. *Id.* The Shade court also assessed a $28,000 award of attorneys fees against Panhandle in favor of the plaintiff.

In· the second case, *Jackson v. Truck Drivers' Union Local 42 Health & Welfare Fund*, 933 F.Supp. 1124 (D.Mass.1996), the court explained more precisely the equitable mechanism it used to award the plaintiff the "appropriate" equitable relief of restitution of benefits. In *Jackson*, the plaintiff was a beneficiary of a Union ERISA health plan. The trustees improperly terminated the plan, leaving the plaintiff without medical benefits to pay the costs for his kidney transplant. When the plaintiff sued, he suggested a "compound remedial scheme" to obtain the equitable relief allowed under § 1132(a)(3). As a first step, the plaintiff "[sought] money damages *on behalf of the plan* from the [fiduciaries] for losses caused by breaching their fiduciary duty of prudent plan administration." *Id.* at 1136 (emphasis added). After these damages were awarded to the plan under §§ 1109 and 1132(a)(2), the plaintiff sought "restitution of his lost benefits [as a] form of equitable relief personally under [§ 1132(a)(3) ]." *Id.*

The *Jackson* court found this argument persuasive, despite the fiduciaries' objections. The first objection that the *Jackson* court dismissed—an objection also raised by R & R in this case—was that "there [was] no·longer a plan on behalf of which [the plaintiff] may seek damages." *Id.*[21] The fiduciary argued that because there no longer existed any ERISA plan, the Court could not order the plan to provide the plaintiff with equitable relief. The *Jackson* court· correctly noted, however, that the fiduciaries' argument went too far:

> . The Court does not accept Defendants' reasoning. Read to its logical endpoint, the argument would hold that fiduciaries whose breach renders a plan insolvent and thus cause[s] it to terminate immunize themselves from ERISA liability. "ERISA is a remedial statute designed to fashion anodynes that protect the interests of plan participants and beneficiaries." *Degnan v. Publicker Industries, Inc.*, 83 F.3d 27, 30 (1st Cir. 1996). As the Supreme Court recog-

---

**21.** In *Jackson*, the trustees improperly terminated the plan via merger with another ERISA fund; in this case, the R & R Health Care Plan terminated because of R & R's failure to pay premiums timely.

nized in a post-*Mertens* opinion very recently handed down, "[g]iven these objectives, it is hard to imagine why Congress would want to immunize breaches of fiduciary obligation that harm individuals by denying injured beneficiaries a remedy." *Varity Corp. v. Howe,* 516 U.S. 489, 116 S.Ct. 1065, 1078, 134 L.Ed.2d 130 (1996). Defendants' crabbed interpretation of [§§ 1109 and 1132(a)(2) ] would leave plan beneficiaries such as [the plaintiff] remediless in the face of the most aggravated breaches of fiduciary duty that cause a plan to fail.

*Id.* at 1136–37. The *Jackson* court went on to hold that "ERISA authorizes [a] court to create a trust or other equitable tool to make plan beneficiaries whole." *Id.* at 1138. The court also concluded that "[i]n the ERISA context, the equitable remedy of restitution includes compelling [fiduciaries] to pay benefits due." *Id.* at 1139.

■ At first glance, it may appear that the *Jackson* court's award of equitable relief is simply an award of damages in disguise—rather than simply ordering the ERISA plan fiduciaries to pay damages to the plaintiff to compensate him for lost medical benefits, the court ordered the fiduciaries to compensate the plan itself, and then ordered the plan to pay the plaintiff his past benefits due. The use of equity, however, makes all the difference. Indeed, precisely this mechanism for providing relief was used by the Eighth Circuit Court of Appeals in *Varity,* a result upheld by the Supreme Court:

> The relief awarded includes payments of money that plaintiffs would have received if they had remained members of the [former plan], but we do not think these payments can properly be characterized as 'damages,' and thus unavailable under [§ 1132(a)(3) ]. Rather, we view the payments as restitution. Equity will treat that as done which ought to have been done. Or, to put it in words that fit the present case more precisely,

equity will disregard that which ought not to have been done .... Payments of past-due benefits are analogous to awards of back pay in Title VII cases, relief uniformly regarded as equitable.

*Howe v. Varity Corp.,* 36 F.3d 746, 756–57 (8th Cir.1994) *affirmed,* 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996); *see also Jackson,* 933 F.Supp. at 1139 (citing other ERISA cases where awards of back benefits to employee plan participants were characterized as equitable restitution). In the end, the *Jackson* court concluded that, given a breach of fiduciary duty, "restitution is available to compel the ... [fiduciaries] personally to pay [the plaintiff's] past-due benefits." *Jackson,* 933 F.Supp. at 1139. That is what McFadden seeks here.

The *Jackson* court further explained that, even if the ERISA plan was no longer in existence, equity allowed the court to create a constructive trust which the fiduciaries would reimburse; restitution to the plaintiff would then come out of this constructive trust. *Id.* at 1129 & 1137–39. In this case, the Court need not create a brand new constructive trust; the "master policy" trust, with the "International Professional Group, Inc." as the trustee, still exists. Although the R & R Health Care Plan ceased to exist in 1996, the trust to which Central Reserve issued the "master policy," of which R & R was a beneficiary, remains vital. Thus, the Court can simply order R & R to pay to the master policy trust an appropriate restitutionary amount, and then order the trust to pay this amount to McFadden as past benefits due. Having concluded that such an Order is appropriate, the only remaining question is what amount the Court should order R & R to pay into the master policy trust.

### D. The Amount R & R Should Pay into the Trust.

To recapitulate, the Court has concluded that: (1) McFadden is entitled to the equitable remedy of restitution; and (2) to

make McFadden whole, this remedy must be carried out by ordering R & R to pay an amount into the "master policy" trust, which the trustee must then pay out to McFadden. The Court must now determine what amount R & R must pay. The formula is relatively simple; the amount should be equal to: (1) the unpaid medical benefits McFadden would have received if R & R had not allowed the group health policy to lapse; minus (2) the amount of premium co-payments McFadden would have had to pay to obtain those benefits.

The second element of this formula is easily ascertained. First, the Court concludes McFadden has proved he would have been eligible under the health insurance policy for COBRA continuation of benefits lasting 18 months, ending on or about March 30, 1997, but for R & R's failure to timely make its premium payments.[22] The parties stipulated that McFadden would have had to pay $2,520 for the 18 months of COBRA insurance coverage he would have received, a figure the Court accepts. The Court must subtract from this amount, however, the $209.25 that R & R deducted from McFadden's last paycheck for premium co-payments.[23] Accordingly, the second element of the formula is $2,310.75.

■ Regarding the first element of the formula, the parties stipulated that: (1) McFadden incurred medical expenses of $46,111.46 during the 26 months following

his September, 1996 diagnosis; but (2) Central Reserve had negotiated discounts with McFadden's medical providers, so that it would have paid the discounted amount of only $25,556.97 on these bills, and the medical providers would have considered themselves paid in full. The Court must resolve whether it should order R & R to pay into the "master policy" trust the amount of McFadden's medical expenses *as billed* ($46,111.46), or instead the amount that the R & R Health Plan would have *actually incurred and paid* on McFadden's claims ($25,556.97).

Of course, R & R argues it should only pay the latter, while McFadden argues it should pay the former. R & R's position is that, if the R & R Health Care Plan had not terminated due to R & R's failure to make timely premium payments, and McFadden had accordingly retained his health insurance coverage, the Plan would have only paid out $25,556.97. McFadden's position is that, regardless of what discounts Central Reserve might have negotiated on behalf of the Plan, R & R's breach of its fiduciary duty has now left *him* with unpaid medical bills of $46,111.46, and his medical providers did not earlier agree that any lesser payment would be satisfactory.

For two reasons, the Court concludes that McFadden's position carries more weight. First, in the only two other comparable cases that this Court could find, the courts agreed with McFadden. As

---

22. There was little doubt at trial that McFadden would have applied for COBRA continuation of benefits, and would have paid the premium necessary to obtain it; Mary Jean Menke assumed as much, herself, when McFadden first became ill. Under R & R's policy, a terminated employee is normally eligible for COBRA benefits for 18 months. Exhibit 104–A at 61. Further, an employee may be eligible for COBRA continuation of benefits for up to 36 months, under certain circumstances. *Id.* Although McFadden suggested, in passing, that he might have been eligible for more than 18 months of COBRA coverage, he did not pursue this position and did not offer evidence at trial supporting his argument. Thus, the Court concludes McFadden was eligible for only 18 months of

COBRA coverage. It appears that the additional unpaid benefits that McFadden might have received during months 19–36 would have been de minimis, in any event. Finally, R & R's argument that McFadden was not eligible for continuation of coverage for even 18 months, because he did not prove he was "entitled to unemployment compensation benefits," is inapposite; the policy makes such entitlement a condition for receiving continued benefits only in *non-COBRA* situations. Exhibit 104–A at 58.

23. As noted, R & R tried to reimburse this amount to McFadden via check, but it is undisputed that the check was never cashed.

noted above, the *Shade* court found that, like in this case, the plaintiff's employer made an administrative error which "prevent[ed] or interfer[ed] with the receipt of benefits to which the participant [was] entitled." *Shade v. Panhandle Motor Serv. Corp.*, 1996 WL 386611 at *4 (4th Cir. July 11, 1996). The result was that plaintiff was left without medical benefits to pay the costs of his liver transplant. The Fourth Circuit Court of Appeals agreed with the district court that "the appropriate remedy was to restore [the plaintiff] to the position *he* would have occupied but for [his employer's] breach of its fiduciary duty." *Id.* (emphasis added) (citing *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2nd Cir.1985)). The position *the plaintiff* would have occupied was to have his benefits paid; thus, to restore the plaintiff, the district court "ordered [the employer] to reimburse [the plaintiff] for all medical expenses incurred," equaling $124,542.89, and subtracting "$1,734.72 in insurance premiums that [the plaintiff] would have had to pay [to the employer's] group health plan during that time." *Id.* It was the amount of medical expenses that the plaintiff "incurred" that was the critical number—not the amount the health care plan could have paid to satisfy the entities that billed the plaintiff. *Id.*

Similarly, in *Jackson v. Truck Drivers' Union Local 42 Health & Welfare Fund*, 933 F.Supp. 1124 (D.Mass.1996), an ERISA health care plan participant "was denied medical benefits for a kidney transplant, renal dialysis, and related dental expenses." *Id.* at 1129. The *Jackson* court denied summary judgment to the defendant, holding that a fact-finder could reasonable conclude that the plaintiff lost his benefits solely because the plan trustees had breached their fiduciary duty. In examining the question of what relief the plaintiff could obtain, the court stated that the appropriate remedy was "to compel the [plan] or the [fiduciaries] to pay [the employee's] past-due benefits." *Id.* at 1139 (stating also that "the equitable remedy of restitution includes compelling

trustees to pay benefits due"). The benefits due to McFadden are, stated simply, payment of his medical expenses—not payment of some discounted amount of his medical expenses.

The second reason the Court finds McFadden's position superior is that, in this case, the relief to which McFadden is entitled is equitable, and "[e]quity will treat that as done which ought to have been done." *Howe v. Varity Corp.*, 36 F.3d 746, 756–57 (8th Cir.1994) *affirmed*, 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996) (holding that restitution included paying benefits to ERISA plan participants). R & R ought to have paid its premium timely, and McFadden's medical bills ought to have been paid. Equity thus demands that R & R make McFadden whole by remitting the amount necessary to pay McFadden's medical bills, which is the benefit McFadden would have received but for R & R's breach of its fiduciary duty.

The only problem remaining is that the parties stipulated McFadden incurred $46,111.46 in medical bills through "the end of 1998," but the Court has concluded that McFadden is entitled only to coverage for 18 months, ending March 30, 1997. Attached to the stipulation, however, as supporting evidence, is a handwritten listing of the date each medical expense was incurred. The expenses McFadden incurred after March 30, 1997 equal $233.00. Thus, the first element of the formula is $46,111.46 − $233.00 = $45,878.46; the second element of the formula is $2,310.75; and the amount McFadden is entitled to in restitution is the difference of $43,567.71.

Accordingly, the Court concludes that McFadden is entitled to restitution, as follows: (1) R & R shall pay $43,567.71 to the Central Reserve "master policy" trust; and (2) the trustees of that trust must then pay out that amount to McFadden.

### III.

Finally, the Court notes that 29 U.S.C. § 1132(g)(1) states that, "[i]n any action

under this subchapter ... by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." In addition, a Court may, in its discretion, award prejudgment interest. *Ford v. Uniroyal Pension Plan,* 154 F.3d 613, 616 (6th Cir.1998). The parties have not addressed the issues of attorney's fees or prejudgment interest. Accordingly, the Court **ORDERS** the parties to brief these issues, pursuant to the following schedule: (1) on the date 21 days from the date of this Order, McFadden will file a brief on the propriety of an attorney fee award and prejudgment interest, and the appropriate amounts; (2) on the date 14 days thereafter, R & R will file a response brief; and (3) on the date 7 days thereafter, McFadden may file a reply brief. If McFadden fails to timely file the first brief, the Court will consider the issues waived.

The Court notes that **this is a final appealable order**, pursuant to Fed. R.Civ.P. 54(b), from which post-judgment interest shall run, pursuant to 28 U.S.C. § 1961. The Court will consider the issues of attorney fees and prejudgment interest in the context of post-judgment motions.

**IT IS SO ORDERED.**